Filed 5/23/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| CALIFORNIA PUBLIC EMPLOYEES' RETIREMENT SYSTEM, Plaintiff and Appellant, v. MOODY'S INVESTORS SERVICE, INC. et al., Defendants and Appellants. | A134912 (San Francisco County Super. Ct. No. CGC-09-490241) |

This is an appeal from an order denying the special motion to strike of defendants Moody's Investors Service, Inc., Moody's Corporation and The McGraw-Hill Companies, Inc. (collectively, Rating Agencies or defendants)[1] against plaintiff California Public Employees' Retirement System (CalPERS) pursuant to the so-called anti-SLAPP statute (Code Civ. Proc., § 425.16).[2] The trial court reached this decision after finding that, although CalPERS' complaint was indeed based upon conduct by the Rating Agencies falling within the scope of the anti-SLAPP statute, dismissal at this stage would be improper because CalPERS successfully demonstrated a probability of prevailing on the merits of its sole claim of negligent misrepresentation. According to

---

[1] Defendant The McGraw Hill Companies, Inc. owns one of the Rating Agencies, Standard & Poor's, referred to herein as "S&P's." Defendants Moody's Investors Service, Inc. and Moody's Corporation are referred to collectively herein as "Moody's." Also named in the complaint are Fitch, Inc., Fitch Group, Inc., and Fitch Ratings LTD, which are not parties to this appeal.

[2] Unless otherwise stated, all statutory citations herein are to the Code of Civil Procedure.

1

the Rating Agencies, the trial court's finding of a probability of prevailing on the merits is erroneous.

CalPERS, in turn, cross-appeals to challenge the trial court's initial finding that its complaint was based upon conduct falling within the scope of section 425.16, arguing that it seeks to hold the Rating Agencies liable for its private, commercial activities rather than for any constitutionally-protected activities. In addition, CalPERS challenges as arbitrary the trial court's ruling to exclude from the record certain of its documentary evidence (to wit, six exhibits) relating to the Agencies' rating activities.

For reasons set forth below, we affirm the trial court's order in its entirety, having concluded that, at this early stage of the proceedings, dismissal pursuant to the anti-SLAPP statute is not warranted.

## FACTUAL AND PROCEDURAL BACKGROUND

On July 9, 2009, CalPERS, the largest state public pension fund in the United States, filed a complaint against the Rating Agencies asserting causes of action for negligent misrepresentation and negligent interference with prospective economic advantage. The complaint challenged the veracity of the Rating Agencies' assignment of highly favorable credit ratings to three structured investment vehicles (SIVs) that ultimately collapsed, causing billions of dollars in losses to CalPERS and other investors. According to the complaint, in 2006 and early 2007, CalPERS, through its agents, invested approximately $1.3 billion of its assets in medium-term notes and commercial paper issued by these SIVs after the Rating Agencies assigned the debt their highest "AAA" or equivalent ratings. When the SIVs subsequently entered bankruptcy or receivership in 2007 or 2008, CalPERS lost "hundreds of millions, and perhaps more than $1 billion."

As this summary of the complaint reflects, proper understanding of CalPERS' allegations requires proper understanding of two things: the SIV entity and its relationship to the Rating Agencies. A SIV is a type of special-purpose investment entity usually formed by a major commercial bank or investment management company that has but one business activity – to wit, issuing debt. The SIV, through its asset manager,

2

purchases mainly medium- and long-term assets for its portfolio with money raised by issuing highly-rated short-term commercial paper and medium-term notes, as well as less highly-rated junior notes. The SIV then generates profits based on the "leveraged spread" between the lower yields the SIV pays to the noteholders for its funding and the higher yield the SIV earns from holding the longer-term assets. SIVs generally have a structural hierarchy of liabilities, the most senior component of which is the commercial paper and medium-term notes and the most junior component of which is the "capital notes" or junior medium-term debt. Losses incurred by a SIV are first absorbed by this junior debt.

According to the complaint, "[t]he assets which make up SIVs are typically represented in offering materials to be mostly highly-rated asset-backed securities from many sectors: financial, auto loans, student loans, credit card loans, home equity loans, residential mortgage-backed securities ('RMBS'), commercial mortgage-backed securities, and other structured finance products like collateralized debt obligations ('CDOs') and collateralized loan obligations ('CLOs')." And the Rating Agencies, of course, are the institutions that provide credit ratings for the notes issued by the SIVs.

As a general matter, these ratings represent an Agency's assessment of the likelihood that a SIV noteholder will be paid the expected amount of principal and interest through the note's maturity date. Before assigning a particular rating, the Rating Agency conducts detailed research and risk analysis with respect to the SIV notes. The Rating Agency, among other things, reviews the results of "various structural tests" run by the SIV's manager to determine whether the SIV would, if the need arose, possess adequate capital, collateral and liquidity to cover a particular period of maturities without having to sell its underlying assets.[3]

Once a rating is given, it is published in the SIV's offering materials made available to potential investors. Pursuant to federal law, SIV debt securities cannot be

---

[3] As CalPERS explains: "In the event that one or more of these tests were breached, and not remedied within the relevant cure period, this would constitute an 'enforcement event' that would trigger the wind-down of the vehicle."

sold to the general public, but only through private placements to two categories of investors: Qualified Institutional Investors (QIBs) and Qualified Purchasers (QPs). (See S.E.C. Rule 144A, 17 C.F.R. § 230.144A(a); 15 U.S.C. § 80a-2(a)(51)(A).) CalPERS is one of the limited number of investors qualifying as both a QIB and QP.

Aside from their inclusion in the SIV offering materials, the ratings were also disseminated more broadly by the Rating Agencies. Generally, when a rating is given, the Agencies post information about the rating in the form of an article on their websites and distribute it to financial reporting services such as Bloomberg and Reuters.[4] These articles not only identify the Agency's rating for a particular note, but also provide detailed commentary regarding the rating methodology and factual basis. The Rating Agencies' websites and articles, as well as the offering materials relevant to this case, also carry cautionary language informing readers that, among other things, ratings are the subjective views of the assigning agency rather than statements of fact; are not a recommendation to buy, sell or hold a particular security; and may be subject to revision, suspension or withdrawal at any time. Readers are further cautioned to undertake independent study and evaluation of the rated security before deciding whether to invest.

In many ways, the Rating Agencies' involvement in the issuance of SIV debt mirrored their involvement in the issuance of more traditional corporate and municipal bonds. For example, the Agencies charged the SIVs a fee for rating their debt, just as they do other corporate or municipal entities. In addition, the Agencies disseminate the SIVs' ratings and accompanying commentary on its websites and to other reporting services, just as they do other bond ratings. However, in certain key regards, the Agencies' relationship with the SIVs was unique.[5] According to the complaint, in the

---

[4]     A Rating Agency generally publishes its rating and accompanying commentary on its free public website for a period of several days, after which the information remains accessible on the agency's subscription-based website. Relevant here, CalPERS maintained subscriptions with each of the Rating Agencies, and thus had a right to access the subscription-based websites.

[5]     Only 28 SIVs were ever created, a few as far back as the late 1980s but most after 2000. In the period from 2005 to 2007 alone, the quantity of assets held by SIVs

4

case of SIVs, and in particular the SIVs at issue in this lawsuit, the Ratings Agencies played a much more active role by actually assisting the issuer in structuring the SIV product in advance of rating it with the mutual goal that the product would have credit characteristics worthy of a high rating. In addition, the Rating Agencies were actively involved in the creation of the structured finance assets, like RMBS and CDOs, held by the SIVs. Often, the SIV's payment of Agency fees was contingent on its notes being offered to potential investors, which, according to CalPERS, would not occur unless the notes earned an "investment grade" rating, generally considered any rating of AAA, A or BBB.[6] As such, "the Rating Agencies had . . . every incentive to give high 'investment grade' ratings, or else they wouldn't receive their full fee" – which, CalPERS says, was an inherent conflict of interest.[7]

It is the nature of the Rating Agencies' role in the SIV market that lies at the heart of CalPERS' lawsuit. Specifically, CalPERS alleges that, with respect to the three collapsed SIVs that caused its enormous investment losses – identified as Sigma, Inc. (Sigma), Stanfield Victoria, Ltd. (Stanfield) and Cheyne Finance, LLC (Cheyne) – the Rating Agencies helped structure not just the SIVs themselves, but also the structured-finance securities that made up their portfolios.[8] Moreover, at least two of these three SIVs had portfolios of over 50 percent RMBSs and CDOs that, according to CalPERS, were "stuffed full of toxic, subprime mortgages, home equity loans, and other types of

increased from $173 billion to nearly half a trillion dollars. None, however, survive today.

[6] Notes rated below BBB are considered sub-investment grade or "junk."

[7] According to the complaint, "[s]tructured finance increasingly became Moody's dominate source of income." Rating a typical SIV generated fees of about $300,000 to as much as $1 million, on top of the fees already generated by rating the SIV's underlying assets. "By contrast, rating a traditional municipal bond of an equivalent size would have generated only [about] $50,000 in fees."

[8] Sigma was formed in 1995 by Gordian Knot, a London-based investment management company. Stanfield was formed in 2002 by New York-based Ceres Capital, a majority stake of which was bought the same year by New York-based Stanfield Capital Partners LLC. Cheyne, in turn, was formed in 2005 by Cheyne Capital Management (UK) LLP, a London-based hedge fund management company.

structured-finance securities linked to subprime mortgages." Nonetheless, the $1.3 billion in commercial paper and medium-term notes that CalPERS' agents purchased from the SIVs were all rated AAA or the equivalent by one or more of the Rating Agencies.[9] According to CalPERS, those ratings, on which it relied, were negligent misrepresentations.[10]

At the time, the Agencies justified their ratings based on the purportedly high quality of the assets purchased by the SIVs (the exact make-up of which was kept confidential), and on the internal structural mechanisms designed to ensure minimum capital levels were maintained to protect SIV investors. CalPERS, however, alleges the Rating Agencies lacked reasonable grounds for such high ratings. Specifically, CalPERS contends the Rating Agencies used flawed and incomplete methodologies that failed to adequately capture market risk, with the result that the SIV ratings were inflated.[11] In

---

[9] Specifically, until at least August 2007, defendant S&P issued a AAA/A-1+ rating to all three SIVs and defendant Moody's issued them each a Aaa/P-1 rating. According to the complaint, these credit ratings are the highest assigned by each agency for long-term debt.

[10] As discussed in more detail below, CalPERS acknowledges that, when these purchases were made on its behalf by authorized agents eSecLending, LLC (eSec) and Credit Suisse First Boston (CSFB), it was unaware of the transactions or of the ratings that had been ascribed to the SIVs by the Rating Agencies.

[11] The complaint explains that the Rating Agencies created or approved structural tests to measure the SIVs' default risk that were "critically flawed" because they did not take into account the "foreseeable scenario" that, if the market soured, the SIVs would be unable to fund itself by either "rolling" more commercial paper *or* by liquidating the assets in their portfolios, causing their collapse. It further explains that the Agencies created or approved investment parameters that permitted the SIVs' portfolios to become overly concentrated in assets of the same class, industry and geographic region (particularly the RMBSs), making them more susceptible to loss. At the same time, it is alleged the Agencies, when rating the RMBSs and CDOs that made up the SIVs' portfolios, used similarly faulty models and inadequate asset correlation values, and failed to account for key risk factors such as the deterioration of loan origination standards for subprime and other mortgage loans and increased default rate for subprime and exotic mortgages as compared to traditional mortgages. The Agencies then relied on the artificially high ratings of the SIVs' underlying assets to assess the overall

6

addition, CalPERS contends market pressures from two sources – to wit, the contingent nature of the Rating Agencies' fee arrangement with the SIVs and the "market share war" among themselves – led the Agencies to employ increasing lax rating standards to ensure SIV products could be issued, thereby prompting a "race to the bottom." In fact, CalPERS contends: "High credit ratings were critical to the SIVs' existence." Without the high ratings indicating stable financial returns, the SIVs would not have attracted buyers, like CalPERS, with institutional policies restricting note purchases to investment grade products. In other words, CalPERS alleges, had the Rating Agencies not given their highest ratings to Cheyne, Stanfield and Sigma, it would not have purchased their debt issues and suffered the significant investment losses when, in 2007 and 2008, the SIVs suffered a series of downgrades and were eventually forced to wind down.

Thus, the underlying complaint, to which the Rating Agencies demurred, was filed.[12] The trial court overruled the demurrer as to negligent misrepresentation and sustained with leave to amend the demurrer as to negligent interference with prospective economic advantage. However, CalPERS elected not to amend its claim for negligent interference with prospective economic advantage, leaving only negligent misrepresentation. The Ratings Agencies, in turn, petitioned for writ of mandate seeking review of the trial court's ruling on demurrer with respect to negligent misrepresentation; however, this Court denied their petition. (*Moody's Investor Services, Inc. v. Superior Court*, No. A128793 (June 29, 2010).)

Subsequently, on October 4, 2010, the Rating Agencies filed the special motion to strike under the anti-SLAPP statute at the heart of this appeal. Through their motion, the Rating Agencies asked the trial court to dismiss CalPERS' lone claim for negligent misrepresentation on the grounds that it is based on activities in furtherance of their right of free speech, and that there was no probability CalPERS could prevail on the merits.

---

creditworthiness of the SIVs, compounding their error. These circumstances allegedly had severe, yet unaccounted for, effects on the SIVs' creditworthiness.

[12] On August 10, 2009, the Rating Agencies timely removed to federal court, but the case was subsequently remanded to state court for lack of diversity jurisdiction.

Following several hearings, the trial court found that the negligent misrepresentation claim fell within the scope of the anti-SLAPP statute, but nonetheless denied the special motion to strike after finding CalPERS had succeeded in proving a probability of success on the merits. Both parties have timely appealed aspects of this decision.

**DISCUSSION**

The Rating Agencies contend CalPERS failed to make a prima facie case of negligent misrepresentation for four reasons, each of which independently requires reversal of the trial court's denial of its anti-Slapp motion. Specifically, the Rating Agencies contend CalPERS failed to produce substantial evidence with respect to each of the following essential elements of its claim: (1) a misrepresented past or existing material fact with respect to the SIV ratings; (2) the absence of a reasonable basis for believing the SIV ratings were true when published; (3) a legal duty owed by the Agencies to CalPERS with respect to the SIV ratings; and (4) actual and justifiable reliance by CalPERS on the SIV ratings. Additionally, the Rating Agencies contend the complaint should have been dismissed on the basis of two of its affirmative defenses – to wit, the First Amendment and preemption – both of which they contend constitute complete legal bars to this lawsuit.

CalPERS, in turn, raises two issues on cross-appeal – to wit, that the trial court erred by (1) finding as an initial matter that its lawsuit comes within the ambit of the anti-SLAPP statute because it is based on activity "arising out of" the Rating Agencies' constitutional right of free speech (§ 425.16, subd. (b)(1)); and (2) excluding from the record six exhibits proffered by CalPERS relating to certain of the Rating Agencies' rating activities.

We address each of these contentions below in proper analytical order after first setting forth the legal principles governing our review.

## I.     The Anti-SLAPP statute.

Section 425.16, the "anti-SLAPP" statute, provides in relevant part: "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in

8

connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim."[13] (§ 425.16, subd. (b)(1).)

The express purpose of the statute is to "encourage continued participation in matters of public significance" and to prevent the "chill[ing]" of such participation "through abuse of the judicial process." (§ 425.16, subd. (a).) To ensure that purpose is met, the California Legislature amended the statute in 1997 to mandate that it "be construed broadly." (*Ibid*., as amended by Stats. 1997, ch. 271, § 1; see also *Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1130.)

Consistent with the statutory language, courts apply a two-prong test when ruling on a special motion to strike. First, the moving defendant must make a prima facie showing that the acts that are the subject of the plaintiff's claims were performed in furtherance of the defendant's constitutional right of petition or free speech in connection with a public issue. (*Equilon Enterprises v. Consumer Cause, Inc*. (2002) 29 Cal.4th 53, 67 (*Equilon*); § 425.16, subd. (b).) If the moving defendant makes this requisite showing, the burden then shifts to the plaintiff to establish, based on competent and admissible evidence, a probability of prevailing on the merits of the plaintiff's claims. (*Ibid*.; *College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704, 719.) "Only a cause of action that satisfies *both* prongs of the anti-SLAPP statute—i.e., that arises from protected speech or petitioning *and* lacks even minimal merit—is a SLAPP, subject to being stricken under the statute." (*Navallier v. Sletten* (2002) 29 Cal.4th 82, 89.)

---

[13] "SLAPP" is an acronym for a strategic lawsuit against public participation. (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 85, fn. 1, citing Canan & Pring, *Strategic Lawsuits Against Public Participation* (1988) 35 Soc. Probs. 506.) SLAPPs are meritless lawsuits brought primarily to harass persons who have exercised their constitutionally protected rights of free speech and petition. (*Dowling v. Zimmerman* (2001) 85 Cal.App.4th 1400, 1424.) The SLAPP statute sets forth a procedure designed to expeditiously resolve SLAPPs at an early stage of the litigation before litigation costs escalate. (*Ibid*.; *Kibler v. Northern Inyo County Local Hospital Dist*. (2006) 39 Cal.4th 192.)

On appeal, we review a trial court's ruling on a special motion to strike de novo. (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 79.) In doing so, we consider the pleadings and the evidence offered in support of and in opposition to the motion, but we do not consider the credibility of witnesses or the weight of the evidence. (*Ibid.*) We also keep in mind that the legislative purpose underlying the anti-SLAPP statute is to promptly dismiss meritless lawsuits designed to chill a defendant's exercise of the constitutionally-protected rights to free speech and petition. (*Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1109; § 425.16, subd. (a).)

A.     **Does CalPERS' action arise from the Rating Agencies' exercise of constitutionally-protected speech activities?**

For purposes of the anti-SLAPP statute, "[an] 'act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue' includes: (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law; (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law; (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest; or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e).) Failure to meet this initial prong renders the anti-SLAPP statute inapplicable, thereby making unnecessary any determination under the second prong whether CalPERS made a prima facie showing of negligent misrepresentation. (*Navallier v. Sletten, supra,* 29 Cal.4th at p. 89.)

Here, CalPERS challenges the trial court's finding under the first prong of the anti-SLAPP statute that its negligent misrepresentation claim "arises from" the Rating Agencies' activity in furtherance of their constitutional right of free speech in connection with a public issue (to wit, the public interest in investment community activities).

10

According to CalPERS, the trial court erred in finding the "gravamen" of its claim arose from the Agencies' "after-the-fact press releases and internet posts [to reporting services like Reuters and Bloomberg]." CalPERS insists its claim arose from the agencies "acts of engineering the SIVs while working hand-in-glove with the issuers, and then providing 'AAA' ratings to those issuers for use in the private placement sale of the SIV securities." Thus, CalPERS contends its claim "would have arisen even if the Rating Agencies had never publicly disseminated the SIV ratings at all." Accordingly, the trial court should have denied the Rating Agencies' anti-SLAPP motion without considering whether CalPERS could demonstrate a probability of success on the merits. We disagree.

The California Supreme Court has explained the first prong of the anti-SLAPP statute as follows: "[T]he statutory phrase 'cause of action . . . arising from' means simply that the defendant's act underlying the plaintiff's cause of action must *itself* have been an act in furtherance of the right of petition or free speech. [Citation.] . . . [T]he critical point is whether the plaintiff's cause of action itself was *based on* an act in furtherance of the defendant's right of petition or free speech. [Citations.] 'A defendant meets this burden by demonstrating that the act underlying the plaintiff's cause fits one of the categories spelled out in section 425.16, subdivision (e) . . . .' " (*City of Cotati v. Cashman, supra,* 29 Cal.4th at p. 78. See also *Navallier v. Sletten, supra*, 29 Cal.4th at p. 89.) In determining whether this burden is met, we keep in mind that " 'the nature or form of the action is not what is critical but rather that it is against a person who has exercised certain rights' [Citation.]" (*Navallier v. Sletten, supra*, 29 Cal.4th at p. 93.) Moreover, "the gravamen of an action is the *allegedly wrongful and injury-producing conduct,* not the damage which flows from said conduct." (*Renewable Resources Coalition, Inc. v. Pebble Mines Corp.* (2013) 218 Cal.App.4th 384, 387.) And, finally, where, as here, the cause of action alleges both protected and nonprotected activities, the statute does not apply if the protected activities are "merely incidental" or "collateral" to the nonprotected activities. (*Peregrine Funding Inc. v. Sheppard Mullin Richter & Hampton LLP* (2005) 133 Cal.App.4th 658, 672 (*Peregrine Funding*). See also *Freeman v. Schack* (2007) 154 Cal.App.4th 719, 727.)

11

Applying these governing principles to this record, we reject CalPERS' claim that its negligent misrepresentation claim is not based in significant part on the Rating Agencies' speech-related activity. CalPERS' complaint itself makes clear the negligent misrepresentation claim arises from allegations that the "Rating Agencies assigned untrue, inaccurate and unjustifiably high credit ratings to the [SIVs]," which were then "*communicated to Plaintiff via the offering materials of the [SIVs], the Rating Agencies' respective websites, through financial reporting services and directly to CalPERS authorized agent . . . .*"

The fact that the complaint also challenges the publication of SIV ratings in otherwise private offering materials available to the select class of qualified investors does not necessarily bring the activity outside the scope of the anti-SLAPP statute. As our colleagues in the Fourth District, Division Three have explained, "in order to satisfy the public issue/issue of public interest requirement of section 425.16, subdivision (e)(3) and (4) of the anti-SLAPP statute, in cases where the issue is not of interest to the public at large, but rather to a limited, but definable portion of the public (a private group, organization, or community), the constitutionally protected activity must, at a minimum, occur in the context of an ongoing controversy, dispute or discussion, such that it warrants protection by a statute that embodies the public policy of encouraging *participation* in matters of public significance." (*Ruiz v. Harbor View Community Assn.* (2005) 134 Cal.App.4th 1456, 1468 [*Ruiz*], citing *Du Charme v. International Brotherhood Electrical Workers* (2003) 110 Cal. App.4th 107, 118-119.) In *Ruiz*, this standard was met where allegedly defamatory statements were contained within two letters from a housing association's attorney to a homeowner regarding the parties' dispute over, among other things, architectural plans. Although these letters were private, they concerned an ongoing dispute that was of interest to a "definable portion of the public" – to wit, the association members, which included residents of over 523 lots, who would be impacted by the dispute's outcome and had a stake in the association's governance. (*Id.* at pp. 1468-1469.) Similarly, this standard was met in *Church of Scientology v. Wollersheim* (1996) 42 Cal.App.4th 628, 650-651, where an individual

brought a private tort suit against a church given that, as the court observed, the "record reflects the fact that the Church is a matter of public interest, as evidenced by media coverage and the extent of the Church's membership and assets." [14] (See also *Damon v. Ocean Hills Journalism Club* (2000) 85 Cal.App.4th 468, 479 [written statements regarding a homeowners' association's internal management touched on issues of public interest because they related to "the very manner in which this group of more than 3,000 individuals would be governed — an inherently political question of vital importance to each individual and to the community as a whole"].)

Likewise, in this case, even focusing on the ratings published in the private SIV offering materials or the subscription-only Rating Agency websites, the record nonetheless reflects that the ratings themselves concerned an ongoing discussion regarding the financial well-being of a significant investment opportunity that was of interest to a definable portion of the public – to wit, the large group of QIBs/QPs eligible to invest millions of dollars or more on behalf of an even greater number of individual pensioners or investors. As such, we conclude the public issue/issue of public interest requirement of section 425.16, subdivision (e) has been satisfied. (See *Equilon, supra*, 29 Cal.4th at p. 67 [defendant need only make a prima facie showing that the acts providing the basis for plaintiff's claim were performed in furtherance of the constitutional right of free speech in connection with a public issue]; see also *ComputerXpress, Inc. v. Jackson* (2001) 93 Cal.App.4th 993, 1008.)

While the Rating Agencies' conduct with respect to the SIV ratings may or may not be worthy of First Amendment protection, an issue we address in Section IIA of this opinion, " '[t]he Legislature did not intend that in order to invoke the special motion to strike the defendant must first establish her actions are constitutionally protected under the First Amendment as a matter of law. If this were the case then the [secondary] inquiry as to whether the plaintiff has established a probability of success would be superfluous.' [Citations.]" (*Navallier v. Sletten, supra*, 29 Cal.4th at pp. 94-95.) Accordingly, we

---

[14] *Church of Scientology v. Wollersheim, supra,* 42 Cal.App.4th 628 was overruled on another ground in *Equilon, supra,* 29 Cal.4th 53.

stand by the trial court's finding that this lawsuit, at minimum, falls within the scope of the anti-SLAPP statute and, thus, continue on to prong two.

**B.      Has CalPERS made a prima facie case of negligent misrepresentation?**

" 'Where the defendant makes false statements, honestly believing that they are true, but without reasonable ground for such belief, he may be liable for negligent misrepresentation, a form of deceit.' (5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 720 at p. 819; see also [Civ. Code,] § 1572, subd. 2 ['[t]he positive assertion, in a manner not warranted by the information of the person making it, of that which is not true, though he believes it to be true']; [Civ. Code,] § 1710, subd. 2 ['[t]he assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true'].)" (*Bily v. Arthur Young & Co*. (1992) 3 Cal.4th 370, 390, 407-408 [*Bily*]. See also *Small v. Fritz Companies, Inc*. (2003) 30 Cal.4th 167, 174 (*Small*) [negligent misrepresentation "encompasses '[t]he assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true' [citation], and '[t]he positive assertion, in a manner not warranted by the information of the person making it, of that which is not true, though he believes it to be true' [citations]"].)

As such, a claim for negligent misrepresentation requires the plaintiff to prove each of the following:  "(1) the misrepresentation of a past or existing material fact, (2) without reasonable ground for believing it to be true, (3) with intent to induce another's reliance on the fact misrepresented, (4) justifiable reliance on the misrepresentation, and (5) resulting damage." (*Apollo Capital Fund LLC v. Roth Capital Partners, LLC* (2007) 158 Cal.App.4th 226, 243 [*Apollo Capital*].)  We address CalPERS' showing with respect to each of these essential elements below.

**1.      Are ratings actionable statements?**

Credit ratings, in CalPERS' words, "reflect the particular rating agency's expert opinion of the underlying financial strength of the security. Typically, ratings may take into consideration various factors, but usually consider the issue of the likelihood of default.  Ratings are based on the aggregate of relevant factors and are expressed in the form of combinations of letters indicating the relative safety or risk of the security. In

14

addition, '+' and '-' signs are employed to signify shades of risk within a given rating score." Or, as the Rating Agencies describe these ratings: "Broadly speaking, ratings express [their] opinion regarding the likelihood that a holder of a particular bond will receive its expected principal and interest payments through the bonds maturity date."

At first glance, resolving whether ratings are actionable misrepresentations for purposes of this tort seems quite straightforward given the oft-stated rule that a speaker's opinion about a future event is not a statement about a past or existing material fact. "It is hornbook law that an actionable misrepresentation must be made about past or existing facts; statements regarding future events are merely deemed opinions." (*San Francisco Design Center Associates v. Portman Cos*. (1995) 41 Cal.App.4th 29, 43-44 [*San Francisco Design*]; see also *Apollo Capital, supra*, 158 Cal.App.4th at pp. 241, 244 ["the statement that eNucleus would be cash flow positive at the end of the first quarter 2000" is "nonactionable as opinion or prediction"]; *Nibbi Bros. Inc. v. Home Fed. Sav. & Loan Assn.* (1988) 205 Cal.App.3d 1415, 1423 ["In tort law, a representation ordinarily will give rise to a cause of action for fraud or deceit only if it is a representation of fact rather than opinion. (Civ. Code, §§ 1572, 1710)"].) Here, for example, the complaint describes the SIV ratings as " 'address[ing] the *likelihood* that investors will receive payments as promised' and 'address[ing] the *expected* loss posed to investors in relation to timely payment of interest (if applicable) and timely payment of principal at par on the final legal maturity date,' " allegations that appear to place the ratings within this nonactionable realm of opinion or prediction. (Italics added.)

However, as CalPERS is quick to note: "Under certain circumstances, expressions of professional opinion are treated as representations of fact. When a statement, although in the form of an opinion, is 'not a casual expression of belief' but 'a deliberate affirmation of the matters stated,' it may be regarded as a positive assertion of fact. (*Gagne v. Bertran* (1954) 43 Cal.2d 481, 489 [275 P.2d 15].) Moreover, when a party possesses or holds itself out as possessing superior knowledge or special information or expertise regarding the subject matter and a plaintiff is so situated that it may reasonably rely on such supposed knowledge, information, or expertise, the defendant's

15

representation may be treated as one of material fact. (*Gagne v. Bertran, supra*, 43 Cal.2d at p. 489; *Cohen v. S & S Construction Company* (1983) 151 Cal.App.3d 941, 946 [201 Cal.Rptr. 173]; see also 5 Witkin, Summary of Cal. Law, *supra*, Torts, § 680 at pp. 781-782; BAJI No. 12.32.)" (*Bily, supra*, 3 Cal.4th at p. 408; see also *Anderson v. Deloitte & Touche* (1997) 56 Cal.App. 4th 1468, 1476-1477 [same]; *Ogier v. Pacific Oil & Gas Dev. Corp.* (1955) 132 Cal.App.2d 496, 506-507 [same]; *Neu-Visions Sports, Inc. v. Soren/McAdam/Bartells* (2000) 86 Cal.App.4th 303, 308 [same].)

Relying on this exception to the general rule, CalPERS argues the ratings in this case are not merely "casual statements of belief," but rather "deliberate assertions based on analysis of non-public, confidential information, and assigned after the Ratings Agencies participated in structuring the SIV's." As such, CalPERS reasons, the ratings should be deemed actionable expressions of professional opinion rather than nonactionable predictions regarding future events.

To support its theory that ratings are more akin to deliberate affirmations of fact based on special knowledge or expertise than mere opinions or predictions, CalPERS offers several declarations, including that of Jean-Baptiste Carelus, the former Standard & Poor's Director in the Structured Finance Rating Group involved in rating the SIVs. As Carelus explains, "Standard & Poor's (in conjunction with the other rating agency(s) participating in the deal) sets the requirements for portfolio composition, capitalization, capital sufficiency, and the management of market and liquidity risk associated with the asset portfolio.[¶] With regard to [SIVs,] Standard & Poor's actively influenced the structure and amount of the debt issued." Further, "[i]f the [S&P] criteria was not applied as directed by [S&P], then the issuer could not achieve its desired rating of AAA/A-1+, which in practice meant the SIV would not be rated at all."

Adding to this evidentiary showing is the declaration of Jack Chen, the former Moody's Senior Credit Officer, who describes the overall SIV industry as existing in a "shroud of secrecy." Noting that "the typical CP and MTN program documents for a SIV discuss only in general broad strokes the potential asset composition of the SIV's portfolio," Chen explains that, "[i]n fact, actual portfolio composition is a highly held

16

secret for SIV's, and even within Moody's such information is only shared on an as-needed basis."

And, similar to Carelus's description of S&P's role in constructing SIVs, the Chen declaration attests that, "[w]hile Moody's analysts would not build or personally review the SIV's capital model, they would request the manager to run various permitted portfolio compositions and stress scenarios until Moody's judged that the model showed reliable results within the specifications Moody's required." Further, while the operational requirements of the SIVs were set forth in legal documents to which the Rating Agencies were not party, the Agencies nonetheless "required that the actual parties to such documents not adopt any substantive or material amendments without obtaining a prior written confirmation from each of them that such proposed amendment or change would not cause them to downgrade or withdraw any of its ratings by altering the structure of the SIV that the agencies had approved."

We agree with CalPERS this evidence reflects that the Rating Agencies published the ratings from a position of superior knowledge, information and expertise regarding the SIVs' composition, underlying structure and function that was not generally available in the market. More specifically, we conclude this evidence reflects not only that the Agencies employed superior knowledge and special information and expertise to assign ratings to the SIVs, they employed their special knowledge, information and expertise to participate in, and exert control over, the very construction of the SIVs. As such, we agree with CalPERS a prima facie case has been made that the ratings are actionable as "professional opinions" or "deliberate affirmations of fact" regarding the nature and quality of the SIV product. (E.g., *Bily, supra*, 3 Cal.4th at p. 408, citing *Gagne v. Bertran, supra*, 43 Cal.2d at p. 489.)

In so concluding, we briefly address the Rating Agencies' argument that, even assuming some professional opinions are actionable as negligent misrepresentations, other professional opinions, like ratings, that speak to *future* events or conditions like an investment's future creditworthiness or value are nonactionable. (See *Neu-Visions Sports, Inc. v. Soren/McAdam/Bartells, supra,* 86 Cal.App.4th at p. 310 ["Value is

17

quintessentially a matter of opinion, not a statement of fact"].) According to the Agencies, CalPERS reliance on *Bily* is misplaced. In *Bily*, the Agengies argue, the California Supreme Court did not reach the question of whether a statement relates to " 'a *past or existing* fact' because the auditor's opinions at issue unquestionably addressed 'past or existing' matters – namely, the company's statement of its then-current financial condition."

Putting aside the scope of *Bily's* holding with respect to actionable professional opinions, we decline, at least at this stage of the proceedings, to read the ratings in this case in such a narrow fashion. Quite simply, CalPERS has provided sufficient evidence to make a prima facie showing that the representations embodied in the ratings reflect not just professional opinions regarding an event in the future such as the likelihood of default, but also regarding a past or existing fact – namely, the then-current composition and quality of the SIV product. As set forth above, the Chen and Carelus declarations make quite clear the Rating Agencies were deeply involved in the very creation of the SIV product. (Pp. 16-17, above.) And, as Carelus adds, the SIVs, by nature, are "perpetual financing vehicles" designed to "continuously roll[] paper." As such, the Ratings Agency continuously monitor the SIVs to ensure ratings remain accurate, withdrawing any rating no longer representative of the SIV's financial condition.[15] Thus, the evidence adequately supports CalPERS contention that ratings do not speak only to the SIVs' likelihood of default or anticipated value at some future date; rather, they speak more generally to the SIVs' present overall financial health, providing confirmation with

---

[15] Indeed, in recognition of the fact that the SIVs were designed to be "perpetual financing vehicles," the SIV ratings were considered "outstanding rating[s]." The Rating Agencies would typically require the SIVs to undergo a "periodic rating confirmation" (usually annually) in order to validate the rating, and would typically charged a "surveillance fee" for its ongoing monitoring of the rating (calculated as a percentage of the amount of CP/MTN the SIV had outstanding). As this information demonstrates, the Rating Agencies, in publishing a rating, did not simply offer investors their best prediction, at the precise time the SIV product was first marketed, as to whether they would eventually be paid in full on their investment. Rather, the Agencies continuously examined the SIV's market performance to ensure the rating was currently valid.

at least some degree of certainty that a particular SIV, as constructed, is capable of performing predictably in the market.[16] (Cf. *Nibbi Bros. v. Home Fed. Sav. & Loan Ass'n, supra,* 205 Cal.App.3d at p. 1423. ["[t]he most that we can derive from the vaguely worded language is that [defendant] optimistically assessed the developer's capacity to sustain continued financing. A representation of this sort constitutes a nonactionable expression of opinion"]; *Neu-Visions Sports, Inc. v. Soren/ McAdam/ Bartells, supra,* 86 Cal.App.4th at pp. 310-311[no factual issue existed as to whether representations were actionable where "inequality of knowledge was not shown" with respect to plaintiffs themselves and the person who made the representations based on allegedly superior knowledge]. See also *Cansino v. Bank of America*, 2014 Cal.App. LEXIS 277, No. H038713, __ Cal.Rptr.3d __ (Sixth App. Dist., March 26, 2014) [differentiating between representations regarding "a business's financial statements during a discrete period covered by [an] audit," which can be actionable, and "prediction[s] of the business's future performance," which generally are nonactionable].)

We thus agree with CalPERS that the record supports the inference that the ratings were not merely predictions regarding the SIVs' future value, but affirmative representations regarding the present state of their financial health and, more specifically, regarding their capacity to provide payments to investors as promised (which capacity they did not in fact have). (See *Abu Dhabi Commer. Bank v. Morgan Stanley & Co*. (S.D.N.Y. 2012) 888 F.Supp.2d 431, 455 ["When a rating agency issues a rating, it is not merely a statement of that agency's unsupported belief, but rather a statement that the rating agency has analyzed data, conducted an assessment, an reached a *fact-based* conclusion as to creditworthiness"].) While the Rating Agencies may dispute the extent

---

[16]     As CalPERS notes, S&P itself described the AAA rating as representing the agency "is comfortable that the minimum capital requirements ensure that under the tested scenarios the senior liabilities will be repaid in full," and that "[the] obligor's capacity to meet its financial commitment on the obligation is extremely strong." Moody's, in turn, defined its Aaa rating as representing the "[o]bligations . . . are judged to be of the highest quality with minimal credit risk."

19

of their involvement in constructing the SIVs, their ability to verify the SIVs' financial health, or the information they intended to convey through their ratings, we are nonetheless confident the requisite prima facie showing has been made regarding this element.

### 2. Was there a reasonable basis for believing the ratings were accurate?

Next, with respect to whether the Rating Agencies had the requisite reasonable basis for believing in the integrity of the ratings at the time of their publication, the complaint describes the following circumstances. First, the SIVs were structured in such a way that they relied on an "asset-liability mismatch" to generate profits, with the SIVs buying long-term assets paying a certain interest rate with funds generated from its sale of short-term commercial paper (CP) and medium-term notes (MTN) to SIV investors like CalPERS. When these shorter-term obligations became due to be paid, the SIVs would "roll" or finance more CP or MTN such that investors would receive new notes rather than payment on original notes. While the Rating Agencies (and SIV managers) correctly presumed a market interruption could occur capable of preventing the SIVs from seamlessly rolling more CP or MTN, they incorrectly and unreasonably presumed they would nonetheless be able to pay investors by liquidating their long-term assets. In fact, the SIVs were structured in such a way that automatic liquidation of long-term assets would be triggered if certain stress levels were met. However, according to CalPERS, the Agencies (and SIV managers) should have presumed and accounted for a market interruption with the capability of disrupting *both* the CP/MTN market and the long-term asset market.[17] The occurrence of this sort of market interruption allegedly caused CalPERS' losses.

To support this theory, CalPERS offers the declaration of Ann Rutledge, an expert in the field of structured finance. Among other things, Rutledge formerly had senior ratings responsibilities at Moody's and authored two professional reference books

---

[17] CalPERS also alleges other structural problems with the SIVs, including the lack of diversification in their underlying assets, which made them more susceptible to losses from any one kind of investment (such as sub-prime CDOs or RMBS).

relating to structured securities. Based on her knowledge and experience regarding credit ratings, Rutledge opines "there was not a reasonable basis for representing [in the SIV literature] that SIV CP/MTNs could repay investors with the certainty represented by an AAA/A-1+ rating from [S&P], an Aaa/Prime-1 rating from Moody's. . . ." Specifically, Rutledge identifies the "basic flaw" in the SIV ratings as follows:

"SIVs had embedded market and liquidity risks that made their level of credit risk inconsistent with top credit ratings. At bottom, the Rating Agencies failed to account for market interruption risk. Their SIV rating methodologies anticipated that a market interruption could cause a liquidity freeze whereby a SIV's ability to roll commercial paper would be halted, and the SIV would not be able to make payments to investors. But in anticipation of such a market interruption, the Rating Agencies assumed SIVs would be able to sell their underlying assets to raise cash in lieu of rolling commercial paper. *They had no empirical or logical basis for that assumption.* In reality, the same market interruption that caused liquidity to dry up would have a severe effect on the SIVs' ability to sell its assets and could cause SIVs to default on their payments to investors. [¶] . . . [¶] [Further,] [t]he Rating Agencies' SIV rating methodologies anticipated market interruption serious enough to halt the ability to roll over paper, but assumed without any support that twenty-eight SIVs holding hundreds of billions of structured finance securities would be able to liquidate enough of those securities – and do so at a high enough price – to pay back investors. *They had no empirical or logical basis for that assumption.*" (Italics added.)

The Rutledge declaration further explains: "The Rating Agencies in the period 2002 to 2004 prescribed increasingly elaborate frameworks of criteria for SIVs. The most significant thing the Rating Agencies did was to allow committed capital to be replaced with cheaper, contingent protections based on tests and triggers. [¶] . . . [¶] . . . *It is my opinion that the Rating Agencies had no basis in logic, theory or experience for promoting the concept that a SIV could repay its CP and MTN liabilities by rolling CP or liquidating its assets when markets seized up.* In their ratings on CP/MTNs from Sigma,

Stanfield Victoria, Cheyne, and other SIVs, the rating Agencies failed to reflect that this increased risk exposure was being passed on to investors." (Italics added.)

Finally, CalPERS offers evidence in the form of the Chen and Carelus declarations of an underlying reason for the Rating Agencies' seemingly illogical behavior in designing and rating the SIVs – to wit, the fact that the Agencies were only paid if the SIV deal closed, which would only happen if a top rating was assigned to the deal. In other words, the Rating Agencies were acting pursuant to a financial incentive to highly rate the SIVs so the securities would be sold to investors and they, in turn, would be paid fees (which, in turn, were generally calculated as a percentage of the amount of securities the SIV had outstanding).

This evidence presented in the Rutledge, Chen and Carelus declarations suffices to prove a prima facie case the Ratings Agency lacked a reasonable basis for believing the accuracy or truthfulness of their ratings.

### 3. Did the Rating Agencies intend to influence CalPERS?

We now turn to the issue of whether the Rating Agencies, when issuing the ratings, intended to influence CalPERS in its decision to invest in the SIV market, such that they assumed a legal duty to CalPERS with respect to these ratings. Where, as here, a negligent misrepresentation claim is brought against the provider of a professional opinion based on special knowledge, information or expertise regarding a company's value, the California Supreme Court requires the following:
 "The representation must have been made with the intent to induce plaintiff, or a particular class of persons to which plaintiff belongs, to act in reliance upon the representation in a specific transaction, or a specific type of transaction, that defendant intended to influence. Defendant is deemed to have intended to influence [its client's] transaction with plaintiff whenever defendant knows with substantial certainty that plaintiff, or the particular class of persons to which plaintiff belongs, will rely on the representation in the course of the transaction. [However,] [i]f others become aware of the representation and act upon it, there is no liability even though defendant should reasonably have foreseen such a possibility." (*Bily, supra,* 3 Cal.4th at p. 414.)

22

Thus, "*Bily* creates an objective standard that looks to the specific circumstances to ascertain whether a supplier of information has undertaken to inform and guide a third party with respect to an identified transaction or type of transaction. If such a specific undertaking has been made, liability is imposed on the supplier. If, on the other hand, the supplier 'merely knows of the ever-present possibility of repetition to anyone, and possibility of action in reliance upon [the information] on the part of anyone to whom it may be repeated,' the supplier bears no legal responsibility."[18] (*Glenn K. Jackson, Inc. v. Roe* (9th Cir. 2001) 273 F.3d 1192, 1200 fn. 3, quoting *Bily, supra*, 3 Cal.4th at p. 410.) See also *Bily, supra*, 3 Cal.4th at p. 409 ["As we read section 552 of the Restatement Second of Torts, it does not seek to probe the state of mind of the . . . supplier of information. Rather, it attempts to identify those situations in which the supplier undertakes to supply information to a third party whom he or she knows is likely to rely on it in a transaction that has sufficiently specific economic parameters to permit the supplier to assess the risk of moving forward"].

Intent to induce reliance is usually a "question of fact" for the jury. (*Bily, supra*, 3 Cal.4th at p. 414.) Moreover, " '[*i*]*ntent to influence is a threshold issue. In its absence there is no liability even though a plaintiff has relied on the misrepresentation to his or her detriment, and even if such reliance were reasonably foreseeable*.' [Citation], italics added.)" (*Bily, supra*, 3 Cal.4th at p. 412.) Thus, "[i]f competent evidence does not permit a reasonable inference that the auditor [or other professionals] supplied its report with knowledge of the existence of a specific transaction or a well-defined type of

---

[18] The parties accept that *Bily* controls on this issue, even though *Bily* involved an auditor rather than a rating agency. As *Bily* clarifies: "Accountants are not unique in their position as suppliers of information and evaluations for the use and benefit of others. Other professionals, including attorneys, architects, engineers, title insurers and abstractors, and others also perform that function. And, like auditors, these professionals may also face suits by third persons claiming reliance on information and opinions generated in a professional capacity." (*Bily, supra*, 3 Cal.4th at p. 410. See also *Soderberg v. McKinney* (1996) 44 Cal.App.4th 1760, 1768 [while "*Bily* involved the liability of accountants (or auditors), we see no reason why its discussion should be limited to that group of professionals"].)

23

transaction which the report was intended to influence, the auditor is not placed on notice of the risks of the audit engagement. In such cases, summary adjudication will be appropriate because plaintiff will not, as a matter of law, fall within the class of intended beneficiaries."[19] (*Bily, supra*, 3 Cal.4th at pp. 414-415.)

Here, CalPERS relies on the following evidence, much of which has already been described, that the Rating Agencies intended through their ratings to influence it to enter into the SIV transactions:  (1) sworn testimony from former senior officers of Moody's and S&P, including Chen and Carelus, that the Agencies expected the SIV issuers to prominently display their ratings in the offering materials and, in at least one instance, gave the issuers express permission to distribute their ratings to prospective investors in the offering materials; (2) copies of the SIV offering materials, reviewed and approved by the Rating Agencies, that expressly state the SIV notes could only be sold to the specified class of QIB/QPs like CalPERS; and (3) the sworn testimony of Chen, Carelus, Rutledge and others that the Rating Agencies "played an integral role in SIVs' structuring and marketing," in that, without the Agencies' approval in the form of an AAA or equivalent rating, the securities would not launch.

This evidence, in our view, supports a reasonable inference that the Agencies supplied its ratings with knowledge of the existence of a well defined type of transaction which the ratings were intended to influence.  As the Carelus declaration succinctly states:  "[T]he audience for the rating was the select class of QIB/QP investors."  As such, consistent with the holding of *Bily*, we conclude that CalPERS has met its burden

---

[19]     In adopting this standard, which is derived from section 552 of the Restatement Second of Torts, the California Supreme Court reasoned as follows: "[C]onfining what might otherwise be unlimited liability to those persons whom the engagement is designed to benefit, the Restatement rule requires that the supplier of information receive notice of potential third party claims, thereby allowing it to ascertain the potential scope of its liability and make rational decisions regarding the undertaking. The receipt of such notice justifies imposition of auditor liability for conduct that is merely negligent. [¶] Moreover, the identification of a limited class of plaintiffs to whom the supplier itself has directed its activity establishes a closer connection between the supplier's negligent act and the recipient's injury, thereby ameliorating the otherwise difficult concerns of causation and of credible evidence of reliance." (*Bily, supra*, 3 Cal.4th at p. 409.)

under section 425.16 to show CalPERS and the other QIB/QP investors constitute a sufficiently narrow and circumscribed class that would have access to and rely upon the ratings when deciding whether to purchase the SIV products. This is particularly true given the obscure and complex nature of the SIV product and the active role the Agencies assumed in creating and marketing it. (See Rest.2d Torts, § 552, com. (h) [noting the "risk of liability to which the supplier subjects himself by undertaking to give the information . . . *is vitally affected by the number and character of the persons, and particularly the nature and extent of the proposed transaction*"] [italics added]. See *Nutmeg Securities, Ltd. v. McGladrey & Pullen* (2001) 92 Cal.App.4th 1435, 1445 [concluding defendant auditor owed a legal duty to a class of IPO underwriters potentially exposed to its audit where such class, no matter how large, had "sufficiently specific parameters" to constitute a "narrow and circumscribed class of persons" for purposes of *Bily*] [*Nutmeg Securities*]; *Anschutz Corp. v. Merrill Lynch & Co.* (N.D. Cal. 2011) 785 F.Supp.2d 799, 826 ["although the class of QIBs might number in the thousands, it is still a circumscribed and identifiable group that the Ratings Defendants not only knew would have access to the ratings but who necessarily rely on the ratings in order to purchase investment grade securities"].)

Quite simply, this is not a case where it is alleged the defendant "merely knew" of the possibility its professional opinions were being shared with third parties. This is a case where CalPERS alleges the Rating Agencies, first, helped create the underlying products and, second, assigned and published ratings on those products that were then prominently featured in marketing materials given to investors interested in purchasing them. (Compare *Nutmeg Securities, supra,* 92 Cal.App.4th at p. 1444 ["where an 'outside' or 'independent' accountant prepares as well as audits a corporation's financial records it is liable for negligent misrepresentation to those third parties who reasonably and foreseeably relied on the financial records, the audit, or both"].)

Accordingly, we decline to hold, at this stage of the litigation, that, as a matter of law, the Rating Agencies owed no duty to CalPERS with respect to the ratings under California law. (*Bily, supra*, 3 Cal.4th at p. 408.)

25

### 4. Did CalPERS actually and justifiably rely on the SIV ratings?

We now address the fourth element of the negligent misrepresentation tort – to wit, whether CalPERS actually and justifiably relied on the ratings when purchasing the SIVs. "Actual reliance occurs when a misrepresentation is ' "an immediate cause of [a plaintiff's] conduct, which alters his legal relations," ' and when, absent such representation, ' "he would not, in all reasonable probability, have entered into the contract or other transaction." ' [Citations.] 'It is not . . . necessary that [a plaintiff's] reliance upon the truth of the . . . misrepresentation be the sole or even the predominant or decisive factor in influencing his conduct. . . . It is enough that the representation has played a substantial part, and so has been a substantial factor, in influencing his decision.' [Citation.]" (*Engalla v. Permanente Med. Grp., Inc*. (1997) 15 Cal.4th 951, 976-977.)

### A. Actual Reliance.

To make a prima facie showing of actual reliance, CalPERS offered declarations from several witnesses, including Phillip Picariello, former Vice President of Portfolio Management for eSecLending, CalPERS' outside investment manager which, along with Credit Suisse First Boston (CSFB), purchased the SIVs on CalPERS' behalf. While Picariello did not himself investigate and purchase the SIVs, he personally observed his co-worker, Saffet Ozbalci, eSecLending's ABS Portfolio Manager, do so.[20] According to Picariello's declaration, "eSecLending did in fact rely on the SIVs' credit ratings in making the SIV investments for CalPERS' portfolio . . . . Indeed, I know that Mr. Ozbalci was only looking at SIVs because they were rated triple A by the rating agencies and in addition they were secured and they offered a minimum yield premium over unsecured investments that had a lower credit rating."

CalPERS also offered a declaration from Daniel Kiefer, CalPERS' Opportunistic Portfolio Manager of the Fixed Income Unit who was involved in the oversight of the SIV purchases. Consistent with Picariello's testimony, Kiefer averred that CalPERS' investment policy, set forth in a document entitled Delegated Lending and Cash

---

[20] Ozbalci left his position with eSecLending in 2008.

Collateral Reinvestment Guidelines (Reinvestment Guidelines), only permitted CalPERS and its authorized agents, including eSecLending and CSFB, to invest in short-term and low duration securities such as the SIV notes if the securities carried certain minimum-level credit ratings.

These restrictions on CalPERS' investment strategy were reiterated by Shurla Warner-George, eSecLending's Compliance Manager, who was aware of, and in fact verified, the company's strict compliance with CalPERS' investment policies for the relevant SIV purchases.  As the Warner-George declaration explains:  "When the CalPERS' investment guidelines require credit ratings of a minimum level, the portfolio manager is prevented from executing a securities trade for CalPERS if the credit ratings for the security are below that level or are absent. [¶] With respect to each SIV purchase made for CalPERS' account by eSecLending, the required credit ratings were entered in accordance with the pre-trade compliance process."

The Rating Agencies dispute the adequacy of CalPERS' evidentiary showing on the ground that Picariello's testimony as to Ozbalci's alleged reliance on the ratings is inadmissible because it "relate[s] to another person' state of mind without any showing of personal knowledge thereof."  (See Evid. Code, § 702.) They further contend that, even if CALPERS' internal policy restricted investments to notes with Aaa/AAA ratings, this fact would not prove CalPERS actually followed its policy when investing in the SIVs. However, whatever the merits of the Agencies' arguments, CalPERS' evidence of actual reliance is, at a minimum, sufficient to make a prima facie case that it would not have invested in the SIVs if the representations reflected in the ratings had not been made. Moreover, while the Agencies will no doubt challenge the extent of Picariello's personal knowledge of Ozbalci's due diligence and execution of trades at trial, we agree with the trial court the necessary foundation for admitting his testimony has been made. Specifically, Picariello's declaration reflects that, not only did he "work[] with Mr. Ozbalci in [the] Boston office, sharing the same workspace almost literally shoulder to

shoulder, for just over three years," he also personally observed Ozbalci's work, including his investigation of and reliance on the SIV ratings.[21]

## B. Justifiable Reliance.

" 'Besides actual reliance, [a] plaintiff must also show "justifiable" reliance, i.e., circumstances were such to make it *reasonable* for [the] plaintiff to accept [the] defendant's statements without an independent inquiry or investigation.' [Citation.] The reasonableness of the plaintiff's reliance is judged by reference to the plaintiff's knowledge and experience. (5 Witkin, Summary of Cal. Law, *supra*, Torts, § 808, p. 1164.) ' "Except in the rare case where the undisputed facts leave no room for a reasonable difference of opinion, the question of whether a plaintiff's reliance is reasonable is a question of fact." [Citations.]' [Citation.]" (*OCM Principal Opportunities Fund, L.P. v. CIBC World Markets Corp*. (2007) 157 Cal.App.4th 835, 864-865 [*OCM Principal*].)

In disputing that CalPERS has made a prima facie showing of justifiable reliance, the Rating Agencies rely on the comprehensive disclaimers of liability accompanying their ratings. For example, Moody's and S&P's provided disclaimers in both the SIV offering documents and their subscription websites advising readers that ratings are not recommendations to "buy, sell or hold" any securities. Another such disclaimer on Moody's subscription website (which CalPERS could and did access) advised: "[A]ny user of the information contained herein should not rely on any credit rating or other opinion contained herein in making any investment decision." In addition, the SIV offering documents expressly provide that, by entering into a transaction to buy SIV notes, the purchaser represents that it has independently investigated the notes by, among other things, seeking out any additional information required to permit it to make an informed purchasing decision.

---

[21]   For example, Picariello averred that he personally observed Ozbalci conduct research on SIVs through the Rating Agencies' subscription websites, among other sources, and then prepare an Excel file matrix to capture his research. This matrix consisted of a chart comparing certain characteristics of different SIVs, including their credit ratings.

While the language in these disclaimers may indeed be comprehensive, as CalPERS points out, it does not speak to the allegations at hand: mainly, that the Rating Agencies promulgated ratings despite lacking a reasonable basis to believe in the ratings' accuracy. We agree. (E.g., *Genesee County Emples. Ret. Sys. v. Thornburg Mortg. Secs. Trust 2006-3* (D.N.M. 2011) 825 F.Supp.2d 1082, 1206 (*Genesee County*).) Indeed, the law is clear that, generally speaking, " '[a] plaintiff will be denied recovery only if his conduct is manifestly unreasonable in the light of his own intelligence or information. It must appear that he put faith in representations that were 'preposterous' or 'shown by facts within his observation to be so patently and obviously false that he must have closed his eyes to avoid discovery of the truth.' [Citation.] Even in case of a mere negligent misrepresentation, a plaintiff is not barred unless his conduct, in the light of his own information and intelligence, is preposterous and irrational. [Citation.]' [Citation.].) The effectiveness of disclaimers is assessed in light of these principles. [Citation.]" (*OCM Principal, supra*, 157 Cal.App.4th at p. 865.) In this case, the presence of certain disclaimers does not necessarily render CalPERS' investment decisions preposterous or irrational.

The Rating Agencies also make much of CalPERS' high level of market sophistication in arguing their reliance was unjustified. However, CalPERS' sophistication, on our record, does not preclude a finding of justifiable reliance. CalPERS has presented evidence that the SIV market existed in a "shroud of secrecy" and very few persons, even within the Agencies themselves, were privy to the SIVs' composition. As such, it is hardly surprising the relevant investor class may have significantly relied on the ratings. In fact, as CalPERS notes, Vicki Tillman, S&P's Executive Vice President of Credit Market Services, acknowledged publicly that: "I want to be clear. Ratings matter; as the individual who oversees S&P's ratings business I would be the last person to suggest to you that they do not." And, in an even more frank acknowledgement, Raymond McDaniel, Moody's President and CEO, told Congress in September 2009 testimony: "Unlike in the corporate market, where investors and other market participants can reasonably develop their own informed opinions based on

29

publicly available information, in the structured finance market, there is insufficient public information to do so. . . . [¶] In the absence of sufficient data, investors are unable to conduct their own analysis and develop their own independent views about potential or existing investments."  (Cf. *U.S.T. Private Equity Inv. Fund, Inc. v. Salomon Smith Barney* (App. Div. 1st Dep't 2001) 288 A.D.2d 87, 733 N.Y.S.2d 385, 386 ["As a matter of law, a sophisticated plaintiff cannot establish that it entered into an arm's length transaction in justifiable reliance on alleged misrepresentations if that plaintiff failed to make use of the means of verification that were available to it, such as reviewing the files of the other parties"]; See *Murphy v. BDO Seidman* (2003) 113 Cal.App.4th 687, 704-705 ["regardless of whether investors *should* rely *solely* on an auditor's report when investing, it seems unassailable that they may assume an auditor's statements are truthful"].)

Accordingly, for the reasons stated, we affirm the trial court's finding that a prima facie case of reliance exists on this record.[22]

## II.    Affirmative defenses.

The Rating Agencies further contend CalPERS cannot prevail on the merits given two affirmative defenses they insist completely bar its negligent misrepresentation claim: the First Amendment and preemption.

As set forth above, a special motion to strike should be granted "if the defendant presents evidence that defeats the plaintiff's claim as a matter of law. [Citation.] Generally, a defendant may defeat a cause of action by showing . . . there is a complete defense to the cause of action. . . .  [A]lthough section 425.16 places on the plaintiff the burden of substantiating its claims, a defendant that advances an affirmative defense to

---

[22]    As CalPERS notes, to make a prima facie showing of reliance, it was not required to provide separate evidence regarding Credit Suisse First Boston's reliance on the ratings when purchasing SIV notes on its behalf.  "If the plaintiff 'can show a probability of prevailing on *any part of its claim*, the cause of action is not meritless" and will not be stricken; "once a plaintiff shows a probability of prevailing on any part of its claim, the plaintiff *has established* that its cause of action has some merit and the entire cause of action stands.' [Citation.]"  (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 820.)

such claims properly bears the burden of proof on the defense. [Citations.]" (*Peregrine Funding, supra,* 133 Cal.App.4th 658, 676.) We address the Rating Agencies' affirmative defenses in light of these principles.

### A. The First Amendment.

The Rating Agencies invoke the First Amendment right to freedom of speech as a complete defense to CalPERS' action based on what they describe as the broad public interest in credit ratings. Specifically, the Agencies contend CalPERS' negligent misrepresentation cause of action fails as a matter of law because CalPERS does not allege and, in any event, could not prove they acted with "actual malice" when issuing the ratings. (See *New York Times v. Sullivan* (1964) 376 U.S. 254, 280 [under the First Amendment, a publisher is protected against liability for a false statement regarding a matter of public concern unless the statement was made with "actual malice," *i.e.*, "with knowledge that it was false or with reckless disregard of whether it was false or not"]; see also *Stewart v. Rolling Stone, LLC* (2010) 181 Cal.App.4th 664, 681 [" ' "Publication of matters in the public interest, which rests on the right of the public to know, and the freedom of the press to tell it, cannot ordinarily be actionable. [Citations.]" [Citation.]' [Citations.]"].)

In asserting this defense, the Rating Agencies direct us to several non-California cases in which courts have applied the "actual malice" standard to various legal claims challenging a defendant's credit ratings. For example, in one such case, a federal district court deemed it "well-established that *under typical circumstances*, the First Amendment protects rating agencies, subject to an 'actual malice' exception, from liability arising out of their issuance of ratings and reports because their ratings are considered matters of public concern. [Fn. omitted.]" (*Abu Dhabi Commer. Bank v. Morgan Stanley & Co*. (S.D.N.Y. 2009) 651 F.Supp.2d 155, 175, italics added. See also *Time, Inc. v. Hill* (1967) 385 U.S. 374, 389 [actual malice standard protects against liability for "innocent or negligent misstatement"].) In another case, *Compuware Corp. v. Moody's Investor Servs*. (6th Cir. 2007) 499 F.3d 520, 526, the Sixth Circuit Court of Appeals applied the actual malice standard before ultimately affirming the dismissal of a defamation claim on

the separate ground that the credit ratings of a publically-traded company (which a SIV is not) are "predictive opinions" that do not "communicate[] any provably false factual connotation." (See also *First Equity Corp. v. Standard & Poor's Corp*. (S.D.N.Y. 1998) 690 F.Supp. 256, 258-259 [to overcome a First Amendment challenge to a fraud claim based on alleged misstatements in defendant's description of corporate bonds, **"**plaintiffs must show either that Standard & Poor's published the description with actual knowledge of its falsity or with reckless disregard of its truth or falsity"].)

As the Rating Agencies correctly note, in our case, there is no allegation they acted maliciously in issuing the relevant ratings. Rather, it is alleged they did so negligently, which " 'is not enough to demonstrate actual malice. [Citation.]' " (*Stewart v. Rolling Stone, Inc., supra,* 181 Cal.App.4th at p. 690.) The Agencies are also correct as a general matter that, to provide the "breathing-space" required by the First Amendment, publishers are not subject to liability for false statements unless such statements were made with "actual malice." (*Gertz v. Robert Welch, Inc*. (1974) 418 U.S. 323, 327-328 (*Gertz*).) In recognition of the fact certain types of speech are "less central to the interests of the First Amendment" and, thus, deserving of less protection, the high court has limited application of the actual malice standard to speech on "matters of public concern." (*Dun & Bradstreet v. Greenmoss Builders* (1985) 472 U.S. 749, 758-760.) Determining whether speech involves "matters of public concern" requires careful weighing of "the State's interest in compensating private individuals for injury . . . against the First Amendment interest in protecting th[e] [particular] type of expression." (*Dun & Bradstreet v. Greenmoss Builders, supra,* 472 U.S. at p. 757.) In *Dun & Bradstreet v. Greenmoss Builder*, for example, the court determined a credit report made available to just "five subscribers, who, under the terms of the subscription agreement, could not disseminate it further" did not implicate matters of public concern and, thus, was not entitled to special First Amendment protection under the actual malice standard, because such speech did not involve "any 'strong interest in the free flow of commercial information.' [Citation.]" (472 U.S. 762.)

Returning to the case at hand, CalPERS argues that, while more traditional credit ratings of publicly-traded securities may, under normal circumstances, constitute speech on matters of public concern, the same cannot be said of the ratings at issue here, which were allegedly issued for private use by the limited class of investors dealing in complex and esoteric nonregistered securities. (Cf. *Compuware v. Moody's Investor Servs., supra*, 499 F.3d at p. 526.) As such, CalPERS contends, the Agencies' speech with respect to the SIVs is not entitled to the greater First Amendment protection afforded under the actual malice standard. Other non-California courts faced with comparable facts have agreed.

In *Anschutz Corp. v. Merrill Lynch & Co., supra*, 785 F.Supp.2d 799, for example, the federal district court found the actual malice standard inapplicable to a negligent misrepresentation claim against rating agencies where the ratings at issue were disseminated to only a select group of investors rather than to the public at large. The court, in denying the rating agency defendants' motion to dismiss, reasoned: "[W]hile other Courts have applied the actual malice standard to claims against rating agencies, they did so only where the ratings were matters of 'public concern.' In *Abu Dhabi Commer. Bank v. Morgan Stanley & Co*., 651 F.Supp.2d at 175, the Court held that credit ratings for a structured investment vehicle, that were only available to a limited group of investors, were not matters of public concern afforded the 'actual malice' level of protection. *Id*. at 176; *see also LaSalle Nat'l Bank v. Duff & Phelps Credit Rating Co.,* 951 F.Supp. 1071, 1096 (S.D.N.Y. 1996) (rejecting actual malice protection where credit rating was 'privately contracted for and intended for use in the private placement Offering Memoranda, rather than for publication in a general publication'); *cf. In re Enron Corp. Sec. Derivative & 'ERISA' Litig.* 511 F.Supp.2d at 825 (S.D. Tex. 2005) (concluding 'that the actual malice standard should apply here because the nationally published credit ratings focus upon matters of public concern, a top Fortune 500 company's creditworthiness.'). The Court in *In re Nat'l Century Fin. Enters*., 580 F.Supp.2d 630, 640 (S.D. Ohio 2008) reached the same conclusion where the ratings were disseminated only to 'a select class of institutional investors with the

33

resources to invest tens of millions of dollars in the notes.' " (*Anschutz Corp. v. Merrill Lynch & Co., supra*, 785 F.Supp.2d at p. 831.)  Accordingly, the court ultimately concluded:  "Plaintiff's allegations, that the ratings at issue here were likewise only distributed to the select group of QIBs, satisfies the Court — at this juncture — that the First Amendment does not require [the plaintiff] to meet the 'actual malice' standard for its misrepresentation claims." (*Anschutz Corp. v. Merrill Lynch & Co., supra*, 785 F.Supp.2d at pp. 831-832.)

This reasoning is indeed persuasive.  Similar to *Anschutz Corp. v. Merrill Lynch & Co.,* the record here reflects the SIV ratings were not published for or disseminated to the general investing public, which, in any event, could not enter into the SIV market.  Rather, they were intended for, and disseminated to, the limited class of institutional investors authorized by law to purchase the unregistered SIV securities in private placement deals – mainly, QIBs and QPs like CalPERS.  Of course the Rating Agencies are quick to note in striving to establish their First Amendment defense that the SIV ratings were posted on both subscription-only and public websites and in a limited number of press releases and internet postings.  However, while this fact does suggest some public dissemination of the SIV ratings, it does not, by itself, shield the Agencies from liability for the ratings under the First Amendment.  To the contrary, given the outstanding factual issues in our record regarding the public-versus-private nature of the SIV ratings, and given the careful weighing required under the First Amendment to ensure proper balance of the State's interest in compensating private individuals for injury and the First Amendment interest in protecting certain type of expression, we conclude resolution of this significant issue at this juncture would be premature.  (See *Dun & Bradstreet v. Greenmoss Builders, supra,* 472 U.S. at pp. 757-758 [courts have "long recognized[,] . . . not all speech is of equal First Amendment importance"].)

Accordingly, we conclude the First Amendment provides no basis for dismissing this case on anti-SLAPP grounds.  As our appellate colleagues in the Second District have aptly stated, "section 425.16 does not apply in every case where the defendant *may* be able to raise a First Amendment defense to a cause of action.  Rather, it is limited to

34

exposing and dismissing SLAPP suits — lawsuits 'brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances' 'in connection with a public issue.' (§ 425.16, subds. (a), (b).)." (*Wilcox v. Superior Court* (1994) 27 Cal.App.4th 809, 819, italics added, disapproved on other grounds in *Equilon, supra*, 29 Cal.4th at p. 68, fn. 5.)[23]

## B.     Preemption.

The Rating Agencies next argue CalPERS' negligent misrepresentation claim is completely and expressly preempted by the Credit Rating Agency Reform Act of 2006 (hereinafter, the "Act" or "CRARA"), 15 U.S.C. section 78o-7.  Congress enacted the CRARA in 2006 with the express intent to "improve ratings quality for the protection of investors and in the public interest by fostering accountability, transparency, and competition in the credit rating agency industry."  (109 P.L. 291 [109 S. 3850] [Sept. 29, 2006].)  The CRARA is designed to accomplish this goal by, among other things, prescribing procedures by which a credit rating agency like Moody's and S&P's may register with the SEC as a nationally recognized statistical rating organization (NRSRO). (*Ibid.*)

Here, the Rating Agencies base their express preemption defense on two provisions of the CRARA – to wit, the "authorization provision" in subdivision (c)(1), which grants the Securities Exchange Commission (SEC) exclusive authority to enforce the Act, and the "limitation provision" in subdivision (c)(2), which bars the SEC and all States from "regulat[ing] the substance of credit ratings or the procedures and

---

[23]     While at first blush our rejection of the First Amendment as a basis for dismissing this case on anti-SLAPP grounds may seem at odds with our earlier conclusion that the Rating Agencies met their initial burden of proving CalPERS' claim arises from their exercise of  constitutionally-protective speech activities, in reality our conclusions are wholly consistent at this stage of the proceedings.  As California courts recognize, a defendant seeking to invoke the special motion to strike need not first establish its actions are constitutionally protected under the First Amendment as a matter of law.  "If this were so the second clause of subdivision (b) of section 425.16 would be superfluous because by definition the plaintiff could not prevail on its claim."  (*Wilcox v. Superior Court, supra,* 27 Cal.App.4th at p. 820.)

methodologies by which any nationally recognized statistical rating organization determines credit ratings."[24]  (15 U.S.C. § 78o-7(c)(1)-(2).)  With respect to the first provision, the Rating Agencies contend "CalPERS's claim is barred . . . to the extent [it] alleges that the Rating Agencies violated conflict-of-interest policies or other internal standards or procedures."  With respect to the second provision, they contend the claim is barred "in light of the fact that it is a direct attack on the 'procedures and methodologies' employed by the Rating Agencies in rating the SIV notes at issue."  The following legal principles govern their contentions.

"Under the supremacy clause of the United States Constitution (art. VI, cl. 2), Congress has the power to preempt state law concerning matters that lie within the authority of Congress. [Citation.] In determining whether federal law preempts state law, a court's task is to discern congressional intent. [Citation.] Congress's express intent in this regard will be found when Congress explicitly states that it is preempting state

---

[24]    These provisions of the CRARA provide in relevant part:
"(c) Accountability for ratings procedures.
 (1) Authority. *The Commission shall have exclusive authority to enforce the provisions of this section in accordance with this title [15 USCS §§ 78a et seq.] with respect to any nationally recognized statistical rating organization, if such nationally recognized statistical rating organization issues credit ratings in material contravention of those procedures relating to such nationally recognized statistical rating organization, including procedures relating to the prevention of misuse of nonpublic information and conflicts of interest*, that such nationally recognized statistical rating organization--
   (A) includes in its application for registration under subsection (a)(1)(B)(ii); or
   (B) makes and disseminates in reports pursuant to section 17(a) [15 USCS § 78q(a)] or the rules and regulations thereunder.
 (2) Limitation. The rules and regulations that the Commission may prescribe pursuant to this title [15 USCS §§ 78a et seq.], as they apply to nationally recognized statistical rating organizations, shall be narrowly tailored to meet the requirements of this title [15 USCS §§ 78a et seq.] applicable to nationally recognized statistical rating organizations. *Notwithstanding any other provision of this section, or any other provision of law, neither the Commission nor any State (or political subdivision thereof) may regulate the substance of credit ratings or the procedures and methodologies by which any nationally recognized statistical rating organization determines credit ratings*. Nothing in this paragraph may be construed to afford a defense against any action or proceeding brought by the Commission to enforce the antifraud provisions of the securities laws."  (15 U.S.C. § 78o-7(c)(1)-(2), Italics added.)

authority. [Citation.]" (*Farm Raised Salmon Cases* (2008) 42 Cal.4th 1077, 1087-1088.)

"The interpretation of the federal law at issue . . . is further informed by a strong presumption against preemption. [Citations.] '[B]ecause the States are independent sovereigns in our federal system, we have long presumed that Congress does not cavalierly pre-empt state- law causes of action. In all pre-emption cases, and particularly in those in which Congress has "legislated . . . in a field which the States have traditionally occupied," [citation], we "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the *clear and manifest purpose* of Congress." [Citations.]' (*Medtronic [Inc. v. Lohr* (1996)] 518 U.S. [470,] 485; [citations]. We apply this presumption to the *existence* as well as the *scope* of preemption. (*Medtronic, supra.* 518 U.S. at p. 485.)" (*Farm Raised Salmon Cases, supra,* 42 Cal.4th at p. 1088 [italics added]. See also *Rice v. Santa Fe Elevator Corp.* (1947) 331 U.S. 218, 230 [express preemption of state law can only be found where it is the "clear and manifest purpose of Congress"].)

Applying these principles, we do not find within the CRARA the requisite "clear and manifest" purpose of Congress to preempt state common law actions for negligent misrepresentation against NRSROs. In so concluding, we rely on several factors. First, such tort claims for fraud or deceit are within a field traditionally occupied by the States, a fact that generally weighs against finding preemption. (*Fenning v. Glenfed, Inc.* (1995) 40 Cal.App.4th 1285, 1298 ["actions for fraud are governed almost exclusively by state law, and do not raise issues of great federal interest"]; *Farm Raised Salmon Cases, supra,* 42 Cal.4th at p.1088.) In fact, as our appellate colleagues long ago recognized: "California's policy is to protect the public from fraud and deception in securities transactions." (*Hall v. Superior Court* (1983) 150 Cal.App.3d 411, 417.)

However, even more significant to our conclusion is the fact that we find nothing in the Act's language amounting to a clear and undeniable indication Congress was acting to extinguish the right of private individuals to sue NRSROs in state court for negligently or intentionally issuing false or misleading credit ratings. Specifically, with respect to the authorization provision in subdivision (c)(1), we agree with CalPERS that

the Agencies' express preemption argument ignores key language within that provision that limits the scope of exclusive enforcement authority granted the SEC.  Specifically, the provision states:

"The Commission shall have exclusive authority to enforce the provisions of this section . . . with respect to any [NRSRO], if such [NRSRO] issues credit ratings in material contravention of those procedures relating to such [NRSRO], including procedures relating to the prevention of misuse of nonpublic information and conflicts of interest, that such [NRSRO] ─

(A) *includes in its application for registration under subsection (a)(1)(B)(ii)*; or

(B) *makes and disseminates in reports pursuant to section 17(a) [15 USCS § 78q(a)] or the rules and regulations thereunder*."   (Italics added.)

Here, there is no allegation the Rating Agencies issued ratings in material contravention of any procedure included in their application for registration under the CRARA or made or disseminated in any reports filed on their behalf "pursuant to section 17(a) [15 USCS § 78q(a)] or the rules and regulations thereunder."  To the contrary, CalPERS has not raised any issue in this case with respect to the Agencies' compliance or noncompliance with any aspect of the CRARA.  (Accord *Anschutz Corp. v. Merrill Lynch & Co., supra,* 785 F.Supp.2d at pp. 829-830 ["The Authorization Provision gives the SEC exclusive authority to enforce the provisions of the CRARA and rules issued by the SEC, [fn. omitted] but there is no language to indicate that the SEC's exclusive authority extends to enforcement of claims that arise from sources *other* than the CRARA"].)

With respect to the second provision relied upon by the Rating Agencies – to wit, the limitation provision – we again do not find the statutory language sufficiently clear to establish congressional intent to wholly eliminate our particular type of legal claim (and to do so, we add, without any proposal for an alternative system of redress for private victims of misleading or deceptive ratings).  As CalPERS notes, this provision can, quite reasonably, be interpreted more narrowly to prohibit the SEC and individual States from requiring NRSROs to use a particular methodology, procedure or substantive criterion to

determine ratings, while continuing to permit them to address NRSRO conduct (or misconduct) with respect to other subject matters such as issuing deceptive ratings. While arguably the statutory text could also be interpreted in the broad manner suggested by the Agencies, under the constitutional principles set forth above, we decline to find express preemption in an atmosphere of such uncertainty.[25] (*Bates v. Dow Agrosciences, LLC* (2005) 544 U.S. 431, 449 [when a statutory preemption clause is susceptible to multiple plausible readings, courts generally "accept the reading that disfavors pre-emption"].)

In any event, we need not determine for purposes of this appeal whether this lawsuit falls entirely outside the scope of the limitation provision. The Rating Agencies may be correct certain issues or theories raised by CalPERS, such as those relating to alleged deficiencies in rating models or data, effectively seek to "regulate the substance of credit ratings or the procedures and methodologies by which any [NRSRO] determines credit ratings." (15 U.S.C. § 78o-7(c)(2).) However, the Rating Agencies will have an opportunity after full discovery to reassert any preemption argument worthy of merit. (See *In re Nat'l Century Fin. Enters., Inc. Inv. Litig.* (S.D. Ohio 2008) 580 F.Sup.2d 630, 651 ["the Court is not prepared to hold that § 78o-7(c)(2) broadly preempts state regulation, without the benefit of fuller briefing of the issue and of what the phrase 'regulate the substance of credit ratings' means. See Kenneth C. Kettering, Securitization and its Discontents:  The Dynamics of Financial Product Development, 29 Cardoza L.

---

[25]    We are not the first court to reach this conclusion with respect to the CRARA's limitation provision.  (See *Genesee County, supra,* 825 F.Supp.2d 1082, 1256 ["when a statute used the term 'regulate,' the phrase 'regulate the substance of credit ratings or the procedures and methodologies by which any nationally recognized statistical rating organization determines credit ratings' does not suggest the Congress intended to preempt claims regarding fraud or misrepresentation, particularly given the clause reserving such enforcement authority to the SEC"]. Accord *Anschutz Corp. v. Merrill Lynch & Co.*, *supra*, 785 F.Supp.2d at p. 829 ["The Limitations Provision . . . prohibits only laws that seek to regulate the 'substance of credit ratings' or the 'procedures or methodologies' by which NRSROs determine credit ratings. There is nothing in the legislative record cited by the Agencies to support their expansive preemption argument"].)

Rev. 1553, 1688-1689 (2008) (noting from the legislative history that § 78o-7(c)(2) was a 'last-minute amendment' which appears to preempt state law 'to some extent,' and, though a 'broad reading of what it means to "regulate the substance" of a rating is discouraged,' the exact extent of preemption is 'a question about which reasonable minds might differ' ")].)  We nonetheless are confident at this stage at least some of CalPERS' claim is capable of surviving preemptive challenge.  A fair reading of the complaint demonstrates CalPERS does not necessarily seek to impose a legal duty to employ any particular rating procedure or methodology within the meaning of the limitation provision, but rather to enforce the duty to issue non-misleading ratings.

Finally, we make one additional observation.  The Rating Agencies have ignored another provision of the CRARA, the "savings provision," that appears to further weigh against preemption.  This provision has two parts, the first of which states:  "No provision of the laws of any State or political subdivision thereof requiring the registration, licensing, or qualification as a credit rating agency or a nationally recognized statistical rating organization shall apply to any nationally recognized statistical rating organization or person employed by or working under the control of a nationally recognized statistical rating organization."  The second part then states:  "Nothing in this subsection prohibits the securities commission (or any agency or office performing like functions) of any State from investigating and bringing an enforcement action with respect to fraud or deceit against any nationally recognized statistical rating organization or person associated with a nationally recognized statistical rating organization."  (15 U.S.C. § 78o-7, subd. (o).)

This language, we conclude, indicates that Congress, when enacting the CRARA, knew exactly how to preserve certain types of laws or claims (i.e., State-brought enforcement actions alleging fraud or deceit), while doing away with others (i.e., State laws requiring registration, licensing or qualification of an NRSRO).  And, more to the point, the provision indicates that, if the Rating Agencies were correct that Congress intended to also do away with private legal actions, like this one, alleging fraud or deceit, Congress could have, and would have, simply added the necessary language to the

40

statute.  As such, the provision further supports our holding.  (See *Medtronic Inc. v. Lohr, supra*, 518 U.S. at p. 486 [congressional intent is "discerned from the language of the pre-emption statute and the 'statutory framework' surrounding it," as well as from " 'structure and purpose of the statute as a whole' "].  Accord *Anschutz Corp. v. Merrill Lynch & Co., supra,* 785 F.Supp.2d at pp. 828-829.)

Accordingly, for all the reasons stated, the Rating Agencies have failed in their burden to prove a complete defense to CalPERS' cause of action.  (*Peregrine Funding, supra,* 133 Cal.App.4th at p. 676.)

## III.    Evidentiary Rulings.

Finally, CalPERS challenges the trial court's exclusion of six exhibits relating to certain of the defendants' rating activities (to wit, Exhibits 20 through 22, and 24 through 26).  Specifically, the exhibits, attached to the declaration of Daniel Barenbaum, consist of Standard & Poor's internal documents produced to the U.S. Senate subcommittee pursuant to its investigation into the financial crisis of years 2007 and 2008.[26]  CalPERS offered this evidence as part of its showing that the Rating Agencies lacked a reasonable basis to believe the accuracy or truthfulness of their ratings.  The trial court, however, excluded it after concluding the exhibits were irrelevant and/or speculative.[27]

Evidentiary challenges are reviewed only for abuse of discretion.  (*Powell v. Kleinman* (2007) 151 Cal.App.4th 112, 122.)  As such, we will not overturn an evidentiary ruling on appeal unless "the trial court exceeded the bounds of reason, all of

---

[26]    For example, Exhibit 20 of the Barenbaum Declaration purports to capture a 2007 electronic mail exchange between S&P's analysts, in which one analyst states "that deal is ridiculous [¶] . . . [¶] we should not be rating it," and a second analyst responds:  "we rate every deal [¶] it could be structured by cows and we would rate it."

Exhibit 22, another apparent electronic mail exchange, states in part: "We are meeting with your group this week to discuss adjusting criteria for ratings CDOs of real estate assets this week [sic] because of the ongoing threat of losing deals.  I am much less concerned about whether it is an actual investor attack or not. Whatever the reason, the fact is, bonds below 'AAA' are pricing wider which impacts the weighted average pricing on the deals. . . ."

[27]    The parties agreed not to raise hearsay or authenticity objections in connection with the anti-SLAPP motion.

the circumstances before it being considered." (*In re Marriage of Connolly* (1979) 23 Cal.3d 590, 598; see also *People v. Preyer* (1985) 164 Cal.App.3d 568, 573.)

Here, CalPERS contends the trial court's ruling was an abuse of discretion because each of the excluded exhibits is "plainly relevant" to one or both of the following Prong Two issues: (1) whether the Rating Agencies had reasonable grounds for believing the accuracy of their own ratings; and (2) whether the Agencies had "a culture and attitude about profit over truthfulness and accuracy with respect to structured-finance ratings."

We disagree. Relevant evidence, of course, is that which has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) Here, as the trial court noted, not one of the excluded exhibits mentions the type of securities named in this complaint – mainly, SIVs. Rather, they appear to relate to other types of securities such as RMBS and CDOs. While CalPERS insists the exhibits nonetheless are relevant because those other types of securities were found in the SIV portfolios, the fact remains there is nothing in the exhibits to link any particular CDO or RMBS mentioned in the exhibits to the portfolios of the SIVs identified in this lawsuit – to wit, the Cheyne, Sigma or Stanfield Victoria SIVs. Nor does CalPERS, the party with the burden to prove error, offer any evidence of an appropriate link between the securities identified in the exhibits and those identified in the complaint. As such, we conclude the trial court had a reasonable basis to exclude the exhibits as irrelevant or overly speculative. (E.g., *People v. Babbitt* (1988) 45 Cal.3d 660, 682 [upholding the trial court's exclusion of evidence where "[t]he inference which [offering party] sought to have drawn from the [proffered evidence] is clearly speculative, and evidence which produces only *speculative* inferences is *irrelevant* evidence"].) We decline to second-guess the trial court's decision in this regard given that it appears neither arbitrary nor irrational on this record. (*People v. Preyer, supra*, 164 Cal.App.3d at p. 573.)

## DISPOSITION

The trial court's order denying the Rating Agencies' anti-SLAPP motion is affirmed in full.  The parties shall bear their own costs on appeal.


_____
Jenkins, J.


We concur:


_____
McGuiness, P. J.


_____
Siggins, J.


*California Public Employees' Retirement System v. Moody's Investors Service, Inc. et al.*, A134912

| | |
|---|---|
| Trial Court: | Superior Court, San Francisco County |

| | |
|---|---|
| Trial Judge: | Hon. Richard A. Kramer |

Counsel for Plaintiff and Appellant: California Public Employees' Retirement System

Berman DeValerio Pease & Tabacco
    Joseph J. Tabacco Jr.
    Todd A. Seaver
    Daniel E. Barenbaum

Counsel for Defendant and Appellant: Moody's Investors Service, Inc. et al.,

Wilson Sonsini Goodrich & Rosati
    Keith E. Eggleton
    David A. McCarthy

Satterlee Stephens Burke & Burke
    Joshua M. Rubins
    James J. Coster
    James I. Doty

Counsel for Defendant and Appellant: The McGraw-Hill Companies, Inc.

Perkins Coie
    David Biderman
    Joren S. Bass
    Judith B. Gitterman

Cahill Gordon & Reindel
    Floyd Abrams
    Dean Ringel
    Whitney M. Smith

*California Public Employees' Retirement System v. Moody's Investors Service, Inc. et al.*, A134912