Filed 2/18/16  In re Ambac Bond Insurance Cases CA1/3

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIRST APPELLATE DISTRICT

### DIVISION THREE

| In re AMBAC BOND INSURANCE CASES. [Two consolidated cases.][*] | A139765 JCCP No. 4555 |
| --- | --- |

In this consolidated proceeding, plaintiffs, a collection of public and nonprofit entities,[1] have alleged claims for, among other things, negligent misrepresentation, violations of the Cartwright Act (Bus. & Prof. Code, § 16700 et seq.), and violations of the Unfair Competition Law (UCL) (Bus. & Prof. Code, § 17200 et seq.) against a collection of credit rating agencies,[2] including The McGraw-Hill Companies, Inc., now

---

[*] *Contra Costa County v. Ambac Financial Group* (S.F. Super. Ct. No. CJC-08-004555) and *The Olympic Club v. MBIA, Inc.* (S.F. Super. Ct. No. CGC-09-487058).

[1] Public entity plaintiffs are: City of Los Angeles, City of Oakland, City of Redwood City, City of Richmond, City of Riverside, City of Riverside as successor agency to City of Riverside Redevelopment Agency, Public Financing Authority of City of Riverside, City of Sacramento, City of San Jose, City of San Jose as successor agency to redevelopment agency of San Jose, City of Stockton, City of Stockton as successor agency to Redevelopment Agency of the City of Stockton, Public Financing Authority of City of Stockton, City and County of San Francisco, Alameda County, Contra Costa County, San Mateo County, Tulare County, East Bay Municipal Utility District, Los Angeles Department of Water and Power, Los Angeles World Airports, Sacramento Municipal Utility District, Sacramento Suburban Water District and The Regents of the University of California. Nonprofit plaintiffs are: Jewish Community Center of San Francisco and The Olympic Club.

[2] The rating agencies originally named as defendants also included Moody's Corporation, Moody's Investors Service, Inc., and Fitch Inc., Fitch Ratings, Ltd., and Fitch Group, Inc. Only the McGraw-Hill Companies, Inc., now known as McGraw Hill Financial, Inc. and Standard & Poor's Financial Services LLC, are parties to the appeal.

1

known as McGraw Hill Financial, Inc. and Standard & Poor's Financial Services LLC (collectively S&P), and bond insurers. [3] The present appeal and cross-appeal arises out of the trial court's ruling on defendants' motions to strike these causes of action as a strategic lawsuit against public participation (SLAPP) under Code of Civil Procedure section 425.16 (the anti-SLAPP statute).[4] S&P contends the court erred in denying its motion to strike plaintiffs' negligent misrepresentation and UCL claims; the bond insurers contend the court erred in denying their motion to strike plaintiffs' UCL claims; and plaintiffs contend the court erred in granting defendants' motions to strike their claims under the Cartwright Act. We reverse the order insofar as it granted bond insurer defendants' motions to strike plaintiffs' claims under the Cartwright Act but affirm the order in all other respects.

## Factual and Procedural Background

Between July 2008 and April 2009, individual plaintiffs filed several complaints against the bond insurer defendants. In May 2009, the individual actions were coordinated and a coordination trial judge was appointed. A year later, the rating agencies were added as defendants. The claims arise out of what plaintiffs describe as the rating agencies' "dual credit rating system," under which the risk of default of bonds issued by municipalities and nonprofit entities was rated higher than the risk on corporate bonds even though the financial risk factors for the municipal and nonprofit bonds were lower than for the corporate bonds. Plaintiffs also claim that the rating agencies misrepresented the financial condition of the bond insurers, ultimately causing plaintiffs to incur substantial losses when the mortgage market collapsed.

---

[3] The bond insurers named as defendants originally consisted of Ambac Assurance Corporation, Ambac Financial Group, Inc., MBIA Inc., MBIA Insurance Corporation, MBIA Insurance Corporation of Illinois, ACA Insurance Corp., Financial Guarantee Insurance Company (FGIC), Financial Security Assurance Inc., Assured Guaranty Corp., and Syncora Guarantee, Inc. Ambac Financial Group, Inc., ACA Insurance Corp., FGIC, and Syncora. were dismissed for various reasons and are no longer parties to the coordinated proceeding.

[4] All statutory references are to the Code of Civil Procedure section unless otherwise noted.

Plaintiffs characterize their claims as follows: "This case arises from commercial transactions between the public entities and nonprofits and the credit rating agencies and bond insurers related to specific tax-exempt municipal bonds the public entities and nonprofits issued to finance public works, including [to] build and maintain schools, hospitals, subsidized housing, utilities and infrastructure. [¶] Before the public entities and nonprofits issued these bonds, the rating agencies charged multi-millions of dollars in fees to provide analytical reviews of and assign credit ratings to the pending bonds under the 'dual credit rating system.' This system made municipal bonds less desirable to investors by uniformly assigning lower credit ratings to municipal bonds than to riskier corporate debt. In turn, the bond insurers charged the public entities and nonprofits multi-millions of dollars in premiums for bond insurance to 'enhance' the credit rating of pending municipal bonds by 'wrapping' the bonds with the bond insurers' highest AAA credit ratings assigned by the rating agencies, for which the bond insurers also paid fees to the rating agencies. In other words, the bond insurers 'rented' their AAA credit ratings to the public entities and nonprofits to overcome the fact that, under the dual credit rating system, the rating agencies did not assign AAA credit ratings to municipal bonds. [¶] The dual credit rating system was highly lucrative for the rating agencies and bond insurers but cost the public entities and nonprofits multi-millions of dollars for analytical reviews, insurance premiums and other fees and costs that corporate issuers did not have to pay. Additionally, under the dual credit rating system, the marketability of bonds issued by the public entities and nonprofits were wholly dependent upon the maintenance by the bond insurers of their highest AAA credit ratings throughout the term of the bonds. [¶] In 2007-2008, the rating agencies downgraded the bond insurers' AAA credit ratings. As a direct result, the public entities and nonprofits suffered substantial damages when many of their bonds became unmarketable, and they were forced to pay higher interest rates, refinancing costs, termination fees, and other significant financial fees, costs and/or penalties. This occurred when the rating agencies and bond Insurers revealed publically that the bond insurers were overexposed to toxic subprime mortgage-backed securities—

3

the collapse of the subprime mortgage market was at the heart of the global financial crisis." (Fn. omitted.)

Of particular concern to the present appeal are plaintiffs' allegations in support of their Cartwright Act and UCL claims that the bond insurers and the rating agencies knew the dual credit rating system was inaccurate and unfair to plaintiffs but unlawfully agreed to maintain the system in order to continue profiting from the system. Plaintiffs' negligent misrepresentation claims turn on allegations that beginning in 2001, the ratings agencies knew that the bond insurers were insuring risky subprime mortgage backed securities and, thus, had no reasonable basis to believe the AAA credit ratings they assigned to the bond insurers were accurate.

In October 2010, the ratings agencies filed special motions to strike under the anti-SLAPP statute. Thereafter, the bond insurers filed their special motions to strike. In July 2013, after extensive briefing and argument, the trial court issued a final order granting the motions to strike the Cartwright Act claims, but denying the motions to strike the UCL and negligent misrepresentation claims.

Both S&P and plaintiffs timely filed notices of appeal from the trial court's order. Thereafter, bond insurers filed notices of cross-appeal in relation to plaintiffs' appeal.

**Discussion**

" 'A special motion to strike is a procedural remedy to dispose of lawsuits brought to chill the valid exercise of a party's constitutional right of petition or free speech. [Citation.] The purpose of the anti-SLAPP statute is to encourage participation in matters of public significance and prevent meritless litigation designed to chill the exercise of First Amendment rights. [Citation.] The Legislature has declared that the statute must be "construed broadly" to that end.' [Citations.] [¶] 'The analysis of an anti-SLAPP motion . . . involves two steps. "First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one 'arising from' protected activity." ' [Citation.] ' "In the anti-SLAPP context, the critical consideration is whether the cause of action is based on the defendant's protected free speech or petitioning activity." ' [Citation.] The court looks to ' "the gravamen or principal thrust" of the

4

action.' [Citations.] [¶] ' "If the court finds [the threshold] showing has been made, it then must consider whether the plaintiff has demonstrated a probability of prevailing on the claim." [Citation.] "Only a cause of action that satisfies both prongs of the anti-SLAPP statute—i.e., that arises from protected speech or petitioning and lacks even minimal merit—is a SLAPP, subject to being stricken under the statute." ' [Citation.] [¶] If the defendant meets its threshold burden and the plaintiff asserts its claims are exempt under the commercial speech exemption of section 425.17, subdivision (c), the plaintiff then has the burden to show the applicability of that exemption. [Citations.] If the plaintiff does not meet that burden, he or she must then establish a probability of prevailing on the claims. [¶] Review of an order granting or denying a motion to strike under section 425.16 is de novo. (*Hawran v. Hixson* (2012) 209 Cal.App.4th 256, 268-269.)

1. **Cartwright Act Claims**

Plaintiffs allege that defendants violated the Cartwright Act by engaging "in an agreement . . . and/or conspiracy to create and maintain artificial conditions for the acquisition of municipal bond insurance." Their claims are based on allegations that the bond insurers and rating agencies conspired to perpetuate an "anticompetitive dual credit rating system." According to the complaint, "[t]he dual credit rating system is a system under which municipal plaintiffs and other issuers of municipal bonds, despite having far lower rates of default, were given lower credit ratings than issuers of corporate bonds with the same or higher risk of default. [¶] . . . The dual credit rating system dramatically increased the price that defendants were able to charge plaintiffs for bond insurance; the amount plaintiffs paid for bond insurance was inversely correlated with their credit ratings; the lower the credit rating of an issuer the higher the premium charged by the bond insurance companies to insure bonds issued by that issuer." According to the complaint, rating agencies also have a significant financial interest in perpetuating the dual credit rating system because the system allows them "to get paid for multiple credit letters" on each transaction. The complaint alleges the rating agencies "knew that there was a disparity between the actual default rates and the intentionally low credit ratings

5

they were giving municipalities" and between 1999 and 2000, "elements within the [ratings agencies] began to publically admit the flawed nature of the dual credit rating system." In response to the suggestions that the system was flawed, "a conspiracy between and among the bond insurance companies and the [ratings agencies] was formed. At the heart of this conspiracy was an agreement by the [ratings agencies] to maintain the dual credit rating system despite the [rating agencies'] admitted recognition of its inherent inaccuracy."

The trial court found that plaintiffs' claims under the Cartwright Act arise from protected activity and that the section 425.17, subdivision (c) exemption for commercial speech did not apply. Turning to the second prong of the anti-SLAPP analysis, the court found that plaintiffs had not made a sufficient showing with respect to their Cartwright Act claims because the necessary element of an agreement had not been demonstrated by substantial evidence. Accordingly, the court granted the defendants' motions to strike plaintiffs' Cartwright Act claims.

*A. Do plaintiffs' Cartwright Act claims arise from protected activity?*

A motion to strike under section 425.16, subdivision (b)(1) may be directed at "[a] cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue . . . ." "The California Supreme Court has explained the first prong of the anti-SLAPP statute as follows: '[T]he statutory phrase "cause of action . . . arising from" means simply that the defendant's act underlying the plaintiff's cause of action must *itself* have been an act in furtherance of the right of petition or free speech. [Citation.] . . . [T]he critical point is whether the plaintiff's cause of action itself was *based on* an act in furtherance of the defendant's right of petition or free speech. [Citations.] . . . In determining whether [defendants'] burden is met, we keep in mind that ' "the nature or form of the action is not what is critical but rather that it is against a person who has exercised certain rights" [citation].' [Citation.] Moreover, 'the gravamen of an action is the *allegedly wrongful and injury-producing*

6

*conduct*, not the damage which flows from said conduct.' [Citation.] And, finally, where . . . the cause of action alleges both protected and nonprotected activities, the statute does not apply if the protected activities are 'merely incidental' or 'collateral' to the nonprotected activities." (*California Public Employees' Retirement System v. Moody's Investors Service, Inc*. (2014) 226 Cal.App.4th 643, 658-659 (*CalPERS*).)

No party disputes that the creditworthiness of the municipalities and nonprofit organizations that are plaintiffs in this action, and the criteria on which their financial condition is evaluated—the matters addressed by S&P's published ratings—are issues of public interest within the meaning of section 425.16, subdivision (e)(4). What is questioned is whether the alleged misconduct on which plaintiffs' Cartwright Act claims are based is conduct in furtherance of "defendants' constitutional right of free speech" on those matters of public interest. "An act is in furtherance of the right of free speech if the act helps to advance that right or assists in the exercise of that right." (*Tamkin v. CBS Broadcasting, Inc*. (2011) 193 Cal.App.4th 133, 143.)

Plaintiffs contend that the critical conduct with respect to their Cartwright Act claims is the alleged agreement between the rating agencies and the bond insurers that the rating agencies would continue to rate plaintiffs' creditworthiness pursuant to a system that defendants knew was unfair and inaccurate. Even assuming that it is the agreement and not the publication of the rating that allegedly injured plaintiffs, the alleged agreement as to how the rating agencies would formulate their ratings is conduct in furtherance of the publication of the ratings, which is an exercise of their right to free speech. Therefore, the alleged agreement advanced or assisted in the exercise of the rating agencies' right to free speech. (See, e.g., *Greater Los Angeles Agency on Deafness, Inc. v. CNN, Inc.* (9th Cir. 2014) 742 F.3d 414, 424 [decision to display videos without closed captioning even if not itself an exercise of free speech constitutes conduct in furtherance of defendant's protected right to report the news.]; *Hunter v. CBS Broadcasting, Inc*. (2013) 221 Cal.App.4th 1510, 1521 [allegedly discriminatory selection of news anchors is conduct in furtherance of the exercise of free speech because it "helped advance or assist" defendant's reporting of the news].) Thus, the trial court

7

correctly determined that S&P met the burden under the first prong of the anti-SLAPP analysis of showing that plaintiffs' claims arise from protected activity.

A different analysis, however, is required for the bond insurer defendants. The bond insurers argue that plaintiffs' claims are based on their "advocacy" on behalf of the dual rating system, which they assert, constitutes protected speech on a matter of public interest. They rely on allegations in plaintiffs' complaint that in response to a suggestion in 2006 that Moody's was considering discontinuing use of the dual rating system, "several bond insurance companies organized a coordinated response" in which "top executives from two of the bond insurance companies met with Moody's top public finance analysts to ensure that despite indications to the contrary, Moody's would abide by the terms of the [agreement]." The bond insurers cite *Clamp-All Corp. v. Cast Iron Soil Pipe Inst*. (1st Cir. 1988) 851 F.2d 478, 487 for the proposition that "advocacy by commercial entities to private standard-setters or others who affect their markets is protected speech."

Plaintiffs disagree. They argue that their Cartwright Act claims do not "seek to impose liability on the bond insurers . . . for participating in a 'public debate about rating systems.' " Rather, they assert that their claims are based on the "secret, behind-the-scenes agreement" between the bond insurers and the rating agencies "to perpetuate [the dual rating system] at the [plaintiffs'] expense." They also argue that the bond insurers' reliance on the 2006 communications involving Moody's ignores the other relevant allegations in the complaint: "While the allegations (and evidence) regarding the bond insurers' attempt to suppress public discussion of the abandonment of the dual credit rating system in 2006 constitutes evidence of an underlying anticompetitive conspiracy, that does not mean the [plaintiffs'] claim is based on or otherwise depends on this evidence. The allegations, which the trial court ignored, show that the conspiracy existed both before and after the 2006 draft request for comments." (Emphasis omitted.)

Although there may be merit to the bond insurers' argument, we need not resolve this issue because we conclude that plaintiffs made a prima facie showing of their ability to prevail on this claim.

8

*B. Does the commercial speech exemption apply?*

Section 425.17, subdivision (c) exempts a cause of action arising from commercial speech from the anti-SLAPP law when "(1) the cause of action is against a person primarily engaged in the business of selling or leasing goods or services; (2) the cause of action arises from a statement or conduct by that person consisting of representations of fact about that person's or a business competitor's business operations, goods, or services; (3) the statement or conduct was made either for the purpose of obtaining approval for, promoting, or securing sales or leases of, or commercial transactions in, the person's goods or services or in the course of delivering the person's goods or services; and (4) the intended audience for the statement or conduct meets the definition set forth in section 425.17[, subdivision] (c)(2)," that is, "an actual or potential buyer or customer, or a person likely to repeat the statement to, or otherwise influence, an actual or potential buyer or customer." (*Simpson Strong-Tie Co., Inc. v. Gore* (2010) 49 Cal.4th 12, 22, 30.)

As stated above, the misconduct alleged in plaintiffs' Cartwright Act cause of action is the allegedly unlawful agreement to use the dual credit rating system to rate plaintiffs' creditworthiness. As such, the cause of action does not arise "from a statement or conduct by [either the rating agencies or the bond insurers] consisting of representations of fact about [the rating agencies' or the bond insurers'] or a business competitor's business operations, goods, or services." (*Simpson Strong-Tie Co., Inc. v. Gore, supra,* 49 Cal.4th at p. 30.) Although the rating agencies allegedly made misrepresentations about the accuracy of their ratings, the falsity of those representations is not the basis of plaintiffs' Cartwright Act cause of action; the nub of the claim is the alleged agreement to use a common dual rating system. Hence, the court properly rejected application of the commercial speech exemption to this cause of action.

C.    *Did plaintiffs establish a probability of prevailing on their claims against the rating agency defendants?*

"To show a probability of prevailing for purposes of section 425.16, a plaintiff must ' " 'make a prima facie showing of facts which would, if proved at trial, support a

9

judgment in plaintiff's favor.' " ' [Citation.] This standard is 'similar to the standard used in determining motions for nonsuit, directed verdict, or summary judgment,' in that the court cannot weigh the evidence. [Citations.] However, the plaintiff 'cannot simply rely on the allegations in the complaint' [citations], but 'must provide the court with sufficient evidence to permit the court to determine whether "there is a probability that the plaintiff will prevail on the claim." ' " (*ComputerXpress, Inc. v. Jackson* (2001) 93 Cal.App.4th 993, 1010.) However, "[a]n anti-SLAPP-suit motion is not a vehicle for testing the strength of a plaintiff's case . . . so early in the proceedings . . . . It is a vehicle for determining whether a plaintiff, through a showing of minimal merit, has stated and substantiated a legally sufficient claim." (*Wilbanks v. Wolk* (2004) 121 Cal.App.4th 883, 906, citing *Equilon Enterprises v. Consumer Cause, Inc*. (2002) 29 Cal.4th 53, 63.)

The elements of plaintiffs' Cartwright Act claim are " ' "(1) the formation and operation of the conspiracy, (2) the wrongful act or acts done pursuant thereto, and (3) the damage resulting from such act or acts." ' " (*Quelimane Co. v. Stewart Title Guaranty Co*. (1998) 19 Cal.4th 26, 47.) As noted above, the trial court found that plaintiffs' failed to make an adequate showing with respect to the formation and operation of the alleged conspiracy.

In *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 851-852, the court set forth the plaintiff's burden when required make a prima facie showing of the existence of an unlawful conspiracy necessary to assert a claim under the Cartwright Act: "[I]n order to carry a burden of production to make a prima facie showing that there is a triable issue of the material fact of the existence of an unlawful conspiracy, a plaintiff, who would bear the burden of proof by a preponderance of evidence at trial, must present evidence that would allow a reasonable trier of fact to find in his favor on the unlawful-conspiracy issue by a preponderance of the evidence, that is, to find an unlawful conspiracy more likely than not. Ambiguous evidence or inferences showing or implying conduct that is as consistent with permissible competition by independent actors as with unlawful conspiracy by colluding ones do not allow such a trier of fact so to find. Antitrust law, including the Cartwright Act, compels the result. Otherwise, it might effectively chill

procompetitive conduct in the world at large, the very thing that it is designed to protect [citation], by subjecting it to undue costs in the judicial sphere. Therefore, in addition, the plaintiff must present evidence that tends to exclude, although it need not actually exclude, the possibility that the alleged conspirators acted independently rather than collusively." (*Id*. at p. 852, fn. omitted.) The court added, "if the court determines that any evidence or inference presented or drawn by the plaintiff indeed shows or implies unlawful conspiracy more likely than permissible competition, it must then deny the defendants'' motion for summary judgment, even in the face of contradictory evidence or inference presented or drawn by the defendants, because a reasonable trier of fact could find for the plaintiff. . . . [¶] But if the court determines that all of the evidence presented by the plaintiff, and all of the inferences drawn therefrom, show and imply unlawful conspiracy *only as likely* as permissible competition or *even less likely*, it must then grant the defendants' motion for summary judgment, even apart from any evidence presented by the defendants or any inferences drawn therefrom, because a reasonable trier of fact could not find for the plaintiff." (*Id*. at pp. 856-857.)

We agree with the trial court that plaintiffs' evidentiary showing that S&P entered into an agreement with any bond insurer or other rating agency to perpetuate the use of the dual credit rating system is insufficient. While plaintiffs unquestionably presented evidence of a strong financial motive and ample opportunity to enter into a conspiracy, there is insufficient evidence, either express or circumstantial, of an actual agreement. Contrary to plaintiffs' argument, the evidence is insufficient to support a reasonable inference that the maintenance of the dual rating system by S&P was "more likely than not" the product of an unlawful conspiracy. Plaintiffs argue: "The rating agencies' and bond insurers' lock-step adherence to the dual credit rating system implies collusion because it is inconsistent with the competitive market forces. Had any one of the three ratings agencies split from the others and applied a corporate equivalent rating scale to municipal bonds, as Moody's contemplated in 2006, or developed a municipal scale that clearly communicated the distinction between municipal and corporate debt, that rating agency would have immediately secured the majority of the municipal bond rating

11

business from the others. [¶] Earning extra revenue from the dual rating system, by contrast, required that all three rating agencies provide ratings services on the same, ineffective municipal scale."

Plaintiffs argue that they submitted substantial evidence "in the form of expert testimony, fact witness testimony and party admissions, showing that the dual credit rating system could not and would not have survived as long as it did absent collusion between the credit rating agencies and the bond insurers." Plaintiffs' strongest evidence that defendants "more likely than not" engaged in a conspiracy comes from the declaration of Joseph Pimbley, whom plaintiffs retained as an "expert in municipal finance, credit enhancements and antitrust investigations." His declaration explains that "[t]he purpose of credit ratings is to provide information to investors on the credit quality of debt securities. Each [ratings agency] fully expects and wants investors to interpret different ratings on two bonds as the [rating agency's] unbiased, expert analysis that the two bonds have differing credit quality." Under the dual rating system, however, the ratings agencies "did not apply similar credit analysis and judgment to all bond sectors— specifically the [rating agencies] did not assign ratings to municipal and corporate bonds in a manner consistent with the affirmative representations of the meaning of the rating levels. [¶] The [ratings agency] default study results beginning in the 1990's should have moved the [rating agencies] to fix their credit rating analyses and assignments. Instead, the [ratings agencies] chose to maintain this 'dual system.' . . . [¶] The [rating agencies] failure to take corrective actions is particularly troubling given that when the [rating agencies] wish to apply different standards to different debt instruments, they specifically and clearly create ratings scales with different symbols. [For example], . . . [t]o avoid confusing investors, the [rating agencies] apply different rating symbols for short-term versus long-term debt. [¶] Had the [rating agencies] truly wished to rate municipal bonds with different meaning for the ratings, they would have created rating scales with distinct symbols and explained them clearly." (Fn. omitted.)

Ultimately, Pimbley concludes that the rating agencies "knowingly failed to assign ratings to municipal bonds in a manner consistent with the affirmative representations of

the meanings of their ratings. This failure did not serve the marketplace; it only served to mislead investors." He concludes that the rating agencies "did not standardize their rating scales in large part because of the [rating agencies'] close relationship with the bond insurers. In short, the [rating agencies] were motivated by financial gain in this deliberate misrepresentation. The bond insurers were motivated by the fact that their business model would collapse if there was no dual credit rating system. These two business models merged to allow the dual credit system to perpetuate for years after the [rating agencies] recognized that the system was unfair and arbitrary." Plaintiffs also presented evidence in support of their claim that when the credit rating agencies "finally made changes to their rating scales, each did so within a small window of time in 2010."

This evidence does not tend to show that the continued use of the system resulted from an unlawful agreement rather than from S&P's determination of its own financial best interests. Plaintiffs do not dispute that the dual credit rating system was established by the rating agencies long before they allegedly discovered it was inaccurate and unfair. As the bond insurance market grew, so did a considerable income stream for the rating agencies. Nothing in the record establishes that the failure of S&P to discontinue the system was the product of an unlawful agreement rather than the reflection of its own financial self-interest. As in the case of any oligopoly, had any one of the rating agencies discontinued the dual rating system, "immediately secur[ing] the majority of the municipal bond rating system from others," as plaintiffs assert, it would expect the other agencies to follow suit and also discontinue use of the dual rating system, thereby decreasing rather than increasing its own profitability. (See Gregory J. Werden, Economic Evidence on the Existence of Collusion: Reconciling Antitrust Law with Oligopoly Theory, 71 Antitrust L.J. 719, 721 (2004).) That is the reason for which parallel action by competitors, without more, is not sufficient to establish the existence of an illegal agreement. (*Biljac Associates v. First Interstate Bank* (1990) 218 Cal.App.3d 1410, 1423, 1428, disapproved on different ground in *Demps v. San Francisco Housing Authority* (2007) 149 Cal.App.4th 564, 566 [Conscious parallel pricing is not in itself unlawful and, without evidence of concerted activity, will not support an inference of

13

antitrust conspiracy.]; *Eddins v. Redstone* (2005) 134 Cal.App.4th 290, 308-309 [consciously parallel behavior will not support an inference of conspiracy without evidence " '(1) that the defendants acted in contradiction of their economic interests, and (2) that the defendants had a motive to enter into an agreement.' "].)

Plaintiffs' "direct evidence of collusion" fares no better at establishing an agreement involving S&P. According to plaintiffs, their "evidence shows that in January 2006, Moody's circulated a draft request for comments among the bond insurers and others in the municipal finance industry that had not been released to the public, which proposed seeking public comment on the abandonment of the dual credit rating system. The bond insurers, by and through a trade association colluded amongst themselves to pressure Moody's not to make any changes that would reduce or eliminate the 'spread' between municipal bonds and corporate debt that comprises the 'heart' of the municipal bond insurance industry. Two executives from the bond insurers met with Moody's shortly thereafter. One of the executives' summary of the meeting—'we were preaching to the choir'—clearly implies that an agreement to maintain the dual credit rating system had been discussed and advanced. Following the bond insurers communications, Moody's released a substantially revised request for comments that removed the exact question that the bond insurers disliked—whether the corporate equivalent scale should be used for U.S. municipal debt in all sectors." (Emphasis omitted.) Moody's January 2006 draft request for comments and its June 2006 request for comments are contained in the record and show that the relevant question went from "Should we expand the assignment of corporate equivalent ratings beyond swaps and taxable cross-border transactions to taxable transactions sold within the United states?" to "Should we (a) expand the assignment of corporate equivalent ratings (CERs) to taxable municipal transactions sold within the United States, (b) continue our current practice of assigning corporate equivalent ratings only to taxable transactions sold outside the United states and swaps, or (c) eliminate the practice of assigning CERs to individual municipal obligations?" The bond insurer defendants stipulated to the contents of emails written by an executive at one of the bond insurance companies noting the potential seriousness of

the proposed changes as well as his intention to contact the trade association "to see if we can draft an industry response" as well as an executive's response following the May 2006 meeting with Moody's. The bond insurers also stipulated that "executives from two bond insurer defendants met with Moody's" in May 2006.

This evidence is insufficient to support an inference that S&P, as compared to Moody's, was a party to any agreement with the bond insurers. While that possibility of course remains, it is no more than speculation in the absence of some evidence linking S&P to entry of the alleged agreement. And, as just indicated, plaintiffs have presented no such evidence.

This evidence is sufficient, however, to support an inference that the bond insurer defendants were parties to an agreement with Moody's. Contrary to the bond insurers' argument, plaintiffs' evidence shows more than that Moody's merely "heard the bond insurers' position and decided to act in accordance with that position." The evidence of the meeting and Moody's subsequent change to its request for comments, coupled with plaintiffs' additional evidence that there is no reasonable justification for perpetuating the system other than an improper financial motive, is sufficient to support the inference (though not conclusive) of a conspiracy. (See *Brown v. Pro Football, Inc.* (1996) 518 U.S. 231, 241 ["Antitrust law also sometimes permits judges or juries to premise antitrust liability upon little more than uniform behavior among competitors, preceded by conversations implying that later uniformity might prove desirable [citations] or accompanied by other conduct that in context suggests that each competitor failed to make an independent decision."]; *Monsanto Co. v. Spray-Rite Serv. Corp.* (1984) 465 U.S. 752, 764 ["[T]he antitrust plaintiff should present direct or circumstantial evidence that reasonably tends to prove that the manufacturer and others 'had a conscious commitment to a common scheme designed to achieve an unlawful objective.' "].)

For purposes of defeating a special motion to strike, plaintiffs need not, as bond insurers suggest, establish all of the details of the conspiracy. While the bond insurers are quick to point out that "there is no indication [in the record] of who these executives were or what companies employed them, what was discussed, whether anything was agreed

upon, or even if they met separately or together with Moody's" that evidence undoubtedly will be pursued during discovery. In *Aguilar v. Atlantic Richfield Co., supra*, 25 Cal.4th at page 857, the court acknowledges that "a plaintiff . . . must often rely on inference rather than evidence since, usually, unlawful conspiracy is conceived in secrecy and lives its life in the shadows." At this early stage of the proceedings the evidence is sufficient to support the inference of a conspiracy, enabling plaintiffs to defeat the bond insurers' motion to strike and attempt to obtain further evidence that will prove their claim.

Finally, the bond insurers argue that absent evidence that they coerced Moody's into the agreement, their "advocacy" is protected by the First Amendment. Bond Insurers again rely on their argument that "[a]dvocacy to a private standards-setting body undertaken on a collective basis by competitors through a trade association or otherwise is protected under the First Amendment." As bond insurers acknowledge, however, the First Amendment does not protect "advocacy" that "involves economic coercion or similar abuse." Nor, does the First Amendment protect advocacy that "serves no legitimate purpose, or that . . . is unnecessarily harmful." (*Clamp-All Corp. v. Cast Iron Soil Pipe Inst., supra*, 851 F.2d at p. 487.) Plaintiffs' evidence that the bond insurer's so-called "advocacy" of the dual credit rating system did not serve a legitimate purpose and was unnecessarily harmful is sufficient to defeat the bond insurers' First Amendment defense for purposes of this motion.

## D.     Conclusion

In summary, we find no error in the court's order striking plaintiffs' Cartwright Act claims against S&P. However, we conclude that plaintiffs made a prima facie showing of their ability to prevail on this cause of action against the bond insurers and that the court erred in striking the Cartwright Act cause of action against those defendants.

## 2. UCL Claims

"The UCL does not proscribe specific acts, but broadly prohibits 'any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising . . . .' (Bus. & Prof. Code, § 17200.) 'The scope of the UCL is quite broad. [Citations.] Because the statute is framed in the disjunctive, a business practice need only meet one of the three criteria to be considered unfair competition.' " (*Durell v. Sharp Healthcare* (2010) 183 Cal.App.4th 1350, 1359.) An act or practice may be actionable as "unfair" under the unfair competition law even if it is not "unlawful." (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 180.)

Nonprofit plaintiffs allege that defendants' actions, "including but not limited to making illegal agreements among themselves to act jointly to perpetuate the dual rating system and thus cause harm to competition in the bond insurance market, fix, stabilize and/or increase the price of bond insurance sold to plaintiff[s]," constitute "unfair, illegal and/or fraudulent business practices within the meaning of Business and Professions Code [section] 17200 et seq."

As indicated above, the trial court found that defendants satisfied their burden under the first prong of the anti-SLAPP analysis with respect to the UCL claims. The court explained that its ruling that the nonprofit plaintiffs had not met their burden under the second prong with respect to the Cartwright Act necessarily precluded a prima facie showing of a violation of the UCL under the unlawful criterion of the statute. The court concluded, however, that plaintiffs had made a prima facie showing under the unfairness criterion of the UCL and denied defendants' motion on that basis.

As indicated in the preceding discussion, we have concluded that the bond insurers' special motion to strike the Cartwright Act cause of action should have been denied. It therefore follows that plaintiffs are entitled to pursue their a UCL cause of action against the bond insurers under the illegality criterion, whether or not that cause of action against them can be sustained under the unfairness criterion. In their briefing and at oral argument, the bond insurers argued that the nonprofit plaintiffs lack standing to

17

pursue their UCL claims against one or both of the remaining bond insurers because they did not purchase bond insurance from those insurers. Their argument is premised on the failure of the nonprofit plaintiffs to present evidence of the existence of a conspiracy to perpetuate the dual rating system. Because we have determined that the evidence of the bond insurers participation in a conspiracy is sufficient to defeat the anti-SLAPP motion addressed to the nonprofit plaintiffs' Cartwright Act claims, the evidence also makes a prima facie showing that the bond insurers' wrongful conduct (participation in the alleged antitrust conspiracy) caused the nonprofit plaintiffs to suffer injury in the form of increased or unnecessary payments for bond insurance. (See, e.g., *Clayworth v. Pfizer, Inc*. (2010) 49 Cal.4th 758, 788 [Pharmacy plaintiffs had standing under UCL as indirect purchaser where "loss was the result of an unfair business practice: Pharmacies paid more than they otherwise would have because of a price-fixing conspiracy in violation of state law."]; *Rosack v. Volvo of America Corp*. (1982) 131 Cal.App.3d 741, 753 ["[A] jury can *infer* the fact of injury when a conspiracy to fix prices has been established and plaintiffs have established that they purchased the affected goods or services. This inference eliminates the need for each class member to prove individually the consequences of the defendants' actions to him or her."])[5]

---

[5] Bond insurers also argued in their briefs that the UCL claims should be dismissed because under this statute there is no form of relief to which the plaintiffs can possibly be entitled. The UCL "provides only limited remedies: restitution and injunctive relief." (*Shersher v. Superior Court* (2007) 154 Cal.App.4th 1491, 1497.) Because the disputed practice is no longer in use, injunctive relief is not available. As to restitution, " 'in the UCL context . . . restitution means the return of money to those persons from whom it was taken or who had an ownership interest in it.' " (*Ibid*; Bus. & Prof. Code, § 17203 ["The court may make such orders or judgments, . . . as may be necessary to restore to any person in interest any money . . . which may have been acquired by means of such unfair competition."].) Direct payment from plaintiff to defendant is not necessary to state a claim under the UCL. (*Shersher, supra,* at p. 1497; *Troyk v. Farmers Group, Inc*. (2009) 171 Cal.App.4th 1305, 1340.) In cases where there is no direct payment, a plaintiff must show that the defendant benefitted from the actions that resulted in an economic loss to plaintiff. (*Shersher*, *supra*, at pp. 1499-1500 [finding that defendant benefitted from plaintiff's purchase of its products from third party dealers despite the fact that payment was not made directly from plaintiff to defendant.]; *Troyk*, *supra*, at

Because we have concluded that the plaintiffs failed to establish a likelihood of success on their Cartwright Act cause of action against the rating agencies, and because these defendants have carried their burden of showing that the UCL cause of action is based on constitutionally protected activity, we must determine whether the nonprofit plaintiffs have made a prima facie showing of their ability to prevail against the rating agencies under the unfairness criterion of the UCL sufficient to overcome the motion to strike.

Under *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*, *supra*, 20 Cal.4th 163, 187, conduct is "unfair" within the meaning of the statute if it "threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." In this case, the trial court concluded that plaintiffs had made a sufficient showing that defendants' conduct was unfair under this standard. The court explained, "Regarding the antitrust public policy, . . . [plaintiffs] say the result of this asserted unfair practice results in a violation of many of the things to which antitrust law in general and the Cartwright Act specifically are directed. [¶] . . . [T]he idea is . . . that this system of rating, dual rating resulting in the rating agencies getting business and the insurance company selling insurance, end up in a closed market where the participants, without regard to an agreement to do this, make a lot of money. [¶] And I think the evidence presented by the plaintiff supports that interpretation . . . . They repeated comments regarding that there is a system that's going on here that results in charging of fees or the charging of insurance premiums, that there's nothing that anybody can do about it, that there's a cost impact on the issuers of bonds

---

pp. 1339-1342 [defendants subject to claim of restitution for service charges paid by consumers to a third party because defendants received a benefit from the payment of such charges and because defendants and the third party acted as a single enterprise].) Here, plaintiffs presented evidence that bond insurers acquired significant financial benefits from their participation in the alleged conspiracy.

19

and the like, and the expert opinion that there's no factual basis for any of this, but everybody is doing it because they see the benefit of it." [6]

S&P's argument that nonprofit plaintiffs, as a matter of law, "cannot restate their failed theory of antitrust harm under an unfairness prong UCL claim" is unfounded. *Chavez v. Whirlpool Corp.* (2001) 93 Cal.App.4th 363, relied on by defendants, does not hold that the absence of illegality precludes a finding of unfairness under the UCL. In that case, the court observed "conduct that the courts have determined to be permissible . . . cannot be deemed 'unfair' under the unfair competition law." (*Id.* at p. 375; see also *Belton v. Comcast Cable Holdings, LLC* (2007) 151 Cal.App.4th 1224, 1240.) But the court explained, "We do not hold that in all circumstances an 'unfair' business act or practice must violate an antitrust law to be actionable under the unfair competition law. Instead we hold that conduct alleged to be 'unfair' because it unreasonably restrains competition and harms consumers . . . is not 'unfair' if the conduct is deemed reasonable and condoned under the antitrust laws." (*Chavez , supra,* at p. 375.) As the trial court here correctly observed, the fact that plaintiffs were unable to substantiate their Cartwright Act claims against the ratings agencies does not mean that defendants' conduct is necessarily immune from liability under the unfairness criterion of the UCL. Since plaintiffs have made a plausible showing that the dual rating system was unreasonable, knowingly

---

[6] The trial court recognized two alternative definitions of "unfair" that may be applicable in this action and found that nonprofit plaintiffs had presented a probability of prevailing under each standard. (See *West v. JPMorgan Chase Bank, N.A.* (2013) 214 Cal.App.4th 780, 806 ["Several definitions of 'unfair' under the UCL have been formulated. They are: [¶] 1. 'An act or practice is unfair if the consumer injury is substantial, is not outweighed by any countervailing benefits to consumers or to competition, and is not an injury the consumers themselves could reasonably have avoided.' [Citation.] [¶] 2. ' "[A]n 'unfair' business practice occurs when that practice 'offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.' [Citation.]" [Citation.]' [Citation.] [¶] 3. An unfair business practice means ' "the public policy which is a predicate to the action must be 'tethered' to specific constitutional, statutory or regulatory provisions." ' "].) Defendants assert that the *Cel-Tech* standard is the only standard applicable in this action. Because we agree with the trial court's conclusion under that standard, we need not consider whether other standards apply or whether nonprofit plaintiffs' showing satisfied other standards as well.

20

resulting in unjustifiable extra insurance costs for the public and nonprofit agencies, the court properly denied the special motion to strike the UCL cause of action against the rating agencies.

## 3. Negligent Misrepresentation Claims

Plaintiffs allege defendants "misrepresented the bond insurance companies' financial strength and concealed from plaintiffs that the bond insurance companies had shifted, and/or had the plan to shift, their risk free business model into the business of insuring exotic and risky financial instruments consisting of bundles of thousands of subprime mortgages. . . . This shift placed the bond insurance companies' financial strength at risk by jeopardizing their 'AAA' rating and ability to provide the credit support they had been paid millions to provide for plaintiffs' . . . bonds. Defendants made these misrepresentations with knowledge of their falsity or at least with no reasonable basis on which to believe in their truth. Defendants made these representations with the intention to induce plaintiffs to purchase bond insurance and leave it in place. Defendants also did so with the expectation that plaintiffs, as among a limited group of bond insurance purchasers, would rely on these misrepresentations and concealments in making these decisions. Had defendants not made these misrepresentations and/or revealed the true facts to plaintiffs, plaintiffs would not have purchased the bond insurance from them . . . and would not have left them in place into 2008. Ultimately, plaintiffs lost millions when the auctions for the [bond] issuances failed as a result of plaintiffs' decisions to purchase the bond insurance for these issuances and to leave it in place."

The trial court concluded that S&P had satisfied its prong one burden: "All of plaintiffs' causes of action against S&P arise out of S&P's speech regarding the publication of opinions and other materials and the dissemination of those opinions and other material concerning matters of concern in the public financial markets." The court found, however, that plaintiffs had presented substantial evidence as to each element

21

necessary to support their causes of action for negligent misrepresentation against S&P and that S&P had not established its affirmative defense under the First Amendment.

The trial court's prong one analysis is likely correct. (See *CalPERS*, *supra*, 226 Cal.App.4th at p. 659.) We need not explore the issue further, however, as we conclude that the trial court's ruling on the second prong is also correct.

"The elements of negligent misrepresentation are (1) the misrepresentation of a past or existing material fact, (2) without reasonable ground for believing it to be true, (3) with intent to induce another's reliance on the fact misrepresented, (4) justifiable reliance on the misrepresentation, and (5) resulting damage." (*Apollo Capital Fund, LLC v. Roth Capital Partners, LLC* (2007)158 Cal. App. 4th 226, 243.) S&P challenges plaintiffs' showing on each element.

S&P contends that their ratings are not actionable statements of fact. They argue that S&P's "ratings of plaintiffs' bonds and of the bond insurers constitute opinions of *future* events." They rely on the allegations in plaintiffs' complaints that the credit ratings express " 'the likelihood of default by the entity that issues debt.' " In *CalPERS, supra*, 226 Cal.App.4th at page 664, this court refused to interpret credit ratings "in such a narrow fashion." We explained, "At first glance, resolving whether ratings are actionable misrepresentations for purposes of this tort seems quite straightforward given the oft-stated rule that a speaker's opinion about a future event is not a statement about a past or existing material fact. 'It is hornbook law that an actionable misrepresentation must be made about past or existing facts; statements regarding future events are merely deemed opinions.' [Citations.] . . . [¶] However, . . . 'Under certain circumstances, expressions of professional opinion are treated as representations of fact. When a statement, although in the form of an opinion, is "not a casual expression of belief" but "a deliberate affirmation of the matters stated," it may be regarded as a positive assertion of fact. [Citation.] Moreover, when a party possesses or holds itself out as possessing superior knowledge or special information or expertise regarding the subject matter and a plaintiff is so situated that it may reasonably rely on such supposed knowledge, information, or expertise, the defendant's representation may be treated as one of material fact." (*Id*. at p. 662; see also

*Anschutz Corp. v. Merrill Lynch & Co. Inc*. (N.D. Cal. 2011) 785 F.Supp.2d 799, 824 [credit rating was actionable either as a " ' "a deliberate affirmation of the matters stated," ' " or because the credit rating agency's opinion is based on its "superior knowledge or special information"]; *Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc*. (S.D.N.Y. 2012) 888 F.Supp.2d 431, 456 [Rating agencies may be liable for fraud "if the ratings *both* misstated the opinions or beliefs held by the [r]ating [a]gencies *and* were false or misleading with respect to the underlying subject matter they address."].)

In this case, plaintiffs submitted evidence that S&P had superior knowledge and special information about the financial condition and creditworthiness of the bond insurers. According to S&P's own documents, S&P "takes great care to assure that the market views its credit ratings as highly credible and relevant, and will continue to review its practices, policies, and procedures on an ongoing basis and modify or enhance them, as necessary, to ensure that rigorous analytics, integrity, independence, objectivity, transparency, credibility, and quality continue as fundamental premises of its operations." In its application for registration as a nationally recognized statistical rating organization, S&P writes that it "provides a credit rating only when, in its opinion, there is information of satisfactory quality to form a credible opinion on creditworthiness, consistent with its *credit rating information and data policy*, and only after applicable quantitative, qualitative, and legal analyses are performed. Throughout the ratings and surveillance process, the analytical team reviews information from both public and nonpublic sources."

In a report entitled "Bond Insurance Criteria: Industry Overview and Analytical Focus," S&P states that its "financial strength rating is a current opinion of the financial security characteristics of an insurance organization with respect to its ability to pay under its insurance policies and contacts in accordance with their terms." S&P's rating methodology for bond insurers "addresses many of the same factors involved in any insurance company's financial strength rating. However, the criteria developed for bond insurers have been tailored to the unique aspects of the financial guaranty business and

23

differ in important respects. [¶] One critical difference . . . is the expectation that only minimal net losses will occur in a normal operating environment. This expectation is based on the credit quality of the insured portfolios, which overwhelmingly consist of issues that are investment grade or near investment grade quality on an uninsured basis." For this reason, S&P employed a "capital adequacy model" to determined the adequacy of capital reserves. "This model tests the ability of the bond insurer to handle claims that would be expected to occur in a hypothetical worst case scenario." Finally, S&P's rating criteria was established with "rating durability in mind" because "[i]nvestors expect that bond insurers' ratings will be stable and not subject to frequent adjustment based on the normal ebbs and flows of credit quality over the traditional economic cycle."

Consistent with its rating criteria, S&P imposed a "minimum capital level" for bond insurers and set a "preferred ownership profile" for bond insurers. S&P set "credit quality composition standards" for bond insurers' portfolios. S&P "periodically monitor[ed] the bond insurer's portfolio to look for any significant credit deterioration that might give rise to a need for additional capital."

In 2007, S&P issued a report stating, "Despite the well-documented deterioration in the world of subprime mortgages, this sector does not appear to be a threat to the rating stability of the bond insurers. We come to this view as the result of the insurers' underwriting standards . . . , their sound risk management practices, . . . and their conservative capital management strategies, which result in cushions that allow for adverse development without jeopardizing their capital adequacies." S&P explained that it had employed a number of analytical tools to determine the bond insurers ability to "withstand subprime stress" and based on the results, S&P concluded the "stress test results are positive."

Taken as a whole, this evidence makes a sufficient showing that the ratings given the bond insurers, although in the form of an opinion, were " 'not a casual expression of belief' but 'a deliberate affirmation of the matters stated' " and that S&P's ratings are based on superior knowledge or special information concerning the then-present financial

24

condition of the insurers and their ability to withstand foreseeable claims against their outstanding policies.

Plaintiffs also made a prima facie showing that S&P did not have reasonable grounds for believing its ratings to be accurate. Plaintiffs' expert, William Sarsfield, opined that "starting no later than 2003, the credit ratings agencies had no reasonable basis to believe that the AAA ratings they assigned to the bond insurers were true and accurate. . . . [T]he credit rating agencies knew or should have known bond insurers did not merit the 'AAA' ratings assigned by the credit ratings agencies because the bond insurers were overexposed to residential backed . . . securities and credit default swaps . . . referencing subprime mortgage debt." Sarsfield explains, "Setting aside internal emails, communications and other evidence showing the credit rating agencies knew or should have known the bond insurers did not merit AAA ratings given the bond insurers' exposure to [residential mortgage backed securities] and [credit default swaps] referencing subprime housing debt, a series of highly publicized government reports clearly called into questions the bond insurers' AAA credit ratings given the bond insurers' exposure to the subprime market. . . . [¶] . . . [¶] These warnings, coupled with a significant run up in securitized subprime lending, clearly placed the credit rating agencies on notice that the bond insurers did not merit AAA credit ratings." S&P's attack on Sarsfield's credentials and opinions are not well taken. S&P argues that "Mr. Sarsfield has never been employed at a ratings agency and has had no experience with the rating process for the bond insurers." In analyzing a SLAPP motion, however, this court does not weigh the credibility of plaintiff's evidence. (*ComputerXpress, Inc. v. Jackson*, *supra*, 93 Cal.App.4th 993, 1010.) S&P also faults Sarsfield for failing to offer an "explanation of the rating process for the bond insurers" and for not identifying "any particular assumptions that he views as lacking any reasonable basis." Sarsfield's declaration, however, cannot be read in a vacuum. Plaintiffs' presented substantial evidence regarding the rating process for bond insurers including, as set forth above, considerable evidence regarding S&P's descriptions of its ratings criteria. Read together, the evidence makes a prima facie showing that given what S&P knew or should have known regarding the

25

bond insurers' exposure to the subprime mortgage market, S&P could not or should not have concluded that the bond insurers merited their AAA ratings under the identified criteria.

Plaintiffs made a sufficient showing of reliance and resulting damage. We reject S&P's argument that plaintiffs failed to establish that S&P owed them a legal duty of care. Although phrased by S&P as a question of duty, the relevant question is whether plaintiffs are within the class of persons entitled to rely on S&P's misrepresentations. In *Bily v. Arthur Young & Co.* (1992) 3 Cal.4th 370, 408, the court explained that "the person or 'class of persons entitled to rely upon the representations is restricted to those to whom or for whom the misrepresentations were made. Even though the defendant should have anticipated that the misinformation might reach others, he is not liable to them.' " This rule "attempts to define a narrow and circumscribed class of persons to whom or for whom representations are made. In this way, it recognizes commercial realities by avoiding both unlimited and uncertain liability for economic losses in cases of professional mistake and exoneration of the auditor in situations where it clearly intended to undertake the responsibility of influencing particular business transactions involving third persons. [This rule] thus appears to be a sensible and moderate approach to the potential consequences of imposing unlimited negligence liability which we have identified." (*Ibid*.) Plaintiffs have more than adequately shown that S&P intended to influence business transactions between plaintiffs and the bond insurers.

Plaintiffs also presented sufficient evidence that they did, in fact, rely on S&P's ratings and were damaged by their reliance. Plaintiffs presented numerous declarations by agents of the various nonprofit and public entities indicating that the entity relied to its detriment on the rating agencies' representations that the bond insurers were AAA rated and that the entity would not have purchased bond insurance without that express representation. Contrary to S&P's argument, the declarations submitted are sufficient for purposes of opposing its motion to strike. (*CalPERs, supra*, 226 Cal.App.4th at p. 672.)

Finally, S&P argues the trial court erred in rejecting its affirmative defense that plaintiffs' claims are barred by the First Amendment. "[A] special motion to strike should

26

be granted 'if the defendant presents evidence that defeats the plaintiff's claim as a matter of law. [Citation.] Generally, a defendant may defeat a cause of action by showing . . . there is a complete defense to the cause of action . . . .' [Citation.] '[A]lthough section 425.16 places on the plaintiff the burden of substantiating its claims, a defendant that advances an affirmative defense to such claims properly bears the burden of proof on the defense.' " (*CalPERs, supra*, 226 Cal.App.4th at p. 674.)

S&P argues that "[u]nder the First Amendment, credit ratings, as opinions, have been held to be fully protected" and, alternatively, that "[e]ven where courts have declined to hold that ratings are absolutely protected, case law makes clear that credit ratings are entitled to First Amendment protection *subject only to* an 'actual malice exception'—requiring proof of actual, subjective 'serious doubt' or disbelief of the statement by the speaker."

Initially, we reject S&P's argument that plaintiffs' claims are barred because they are based on its protected expression of opinion rather than a provable false factual statement. As discussed above, plaintiffs made a prima facie showing that S&P's AAA ratings of the bond insurers was a representation of fact sufficient to withstand the motion to strike. Accordingly, S&P's rating is not entitled to absolute protection under the First Amendment.

We likewise reject S&P's argument that plaintiffs' negligent misrepresentation claims are subject to the "actual malice" standard applicable in defamation and libel cases. *Compuware Corp. v. Moody's Investors Servs., Inc*. (6th Cir. 2007) 499 F.3d 520, relied on by S&P is instructive. In that case, plaintiff contracted with defendant credit rating agency for a determination of plaintiff's overall creditworthiness. Later, after defendant issued a report downgrading plaintiff's rating, plaintiff filed an action for breach of contract and defamation against defendant. After concluding that plaintiff had failed to produce evidence of actual malice sufficient to withstand summary judgment of its defamation claim (*id.* at pp. 526-528), the court held that the "actual malice" requirement also applied to plaintiff's breach of contract claim and supported the granting of summary judgment of that claim as well. (*Id*. at p. 529.) The court explained,

27

"Ordinarily, 'enforcement of . . . general laws against the press is not subject to stricter scrutiny than would be applied to enforcement against other persons or organizations.' [Citation.] But stricter scrutiny may be warranted where a plaintiff attempts to use a state-law claim 'to avoid the strict requirements for establishing a libel or defamation claim.' " (*Id.* at p. 529; see also *County of Orange v. McGraw Hill Companies, Inc.* (C.D. Cal. 1999) 245 B.R. 151, 155 ["Although these issues traditionally arise in libel or defamation actions, the actual malice standard applies to other causes of action when the plaintiff seeks compensatory damages arising from allegedly false statements."].) The court concluded that the breach of contract claim was premised on the defamation claim insofar as "it is inescapable that Compuware seeks compensation for harm caused to its reputation." (*Id.* at p. 530.) The court continued, "We see no material difference between this claim—which, although labeled one for breach of contract, essentially asserts that Moody's acted incompetently (i.e., negligently) in compiling and evaluating its publication of protected expression—and a tort claim based on conduct that might support a pendant defamation claim." (*Id.* at p. 532.)

In stark contrast, plaintiffs' negligent misrepresentation claim is not "based on conduct that might support a pendant defamation claim" and is not based on injuries to plaintiffs' reputations. Plaintiffs' claims are based on positive statements about the creditworthiness of the bond insurers that plaintiffs allege were false. There is no basis on which to apply the actual malice standard and no error in the court's denial of S&P's motion to strike.

### Disposition

The trial court's order on defendants' motions to strike under section 425.16 is reversed insofar as it ordered plaintiffs' Cartwright Act claims against the bond insurer defendants stricken and is affirmed in all other respects. The parties shall bear their own costs on appeal.

_____

Pollak, J.

We concur:

_____

McGuiness, P. J.

_____

Jenkins, J.

A139765